NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LONG BEACH YOUTH CENTER, INC.,
et al., Respondent.

LONG BEACH YOUTH CENTER, INC.,
et al., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 77–3522, 77–3661.

United States Court of Appeals,
Ninth Circuit.

Jan. 17, 1979.

Anne H. Andrews, Michael Murchison, Attys., N. L. R. B., Washington, D. C., for N. L. R. B.

David G. Finkle, Ball, Hunt, Hart, Brown & Baerwitz, Los Angeles, Cal., for Long Beach Youth Center, Inc., et al.

Before HUFSTEDLER and TANG, Circuit Judges, and TAKASUGI,* District Judge.

TANG, Circuit Judge.

The facts were stipulated and hearing before an administrative law judge waived. The facts may be summarized as follows:

Long Beach, a non-profit charitable corporation, operates a residential facility for emotionally disturbed male adolescents with drug-related problems. Long Beach provides medical, psychological, counseling and social work services for the residents, who are primarily referred to Long Beach by the Department of Social Services and the Probation Department. The staff at Long Beach functions as "surrogate parents" for the residents. Long Beach is a health care facility as defined in § 2(14) of the Act [29 U.S.C. § 152(14)].

On April 30, 1975, three Long Beach employees met on the Long Beach premises and planned a work stoppage (a "sick-in") to protest working conditions. They also made plans to apply for membership in Local 399, Hospital and Service Workers Union, AFL–CIO (Union).

On May 1, 1975, five child care counselors (the whole morning shift) called in sick prior to the time they were supposed to report for work. During the next 24 hours, a total of 17 employees ceased work to protest working conditions. No notice of this work stoppage was given to Long Beach. The Union was not responsible for, nor did it encourage the work stoppage.

The 17 employees met on May 1, 1975 to draw up a list of demands on management. At this same meeting, all 17 signed authorization cards for the Union. The list of demands was presented to Long Beach on May 2, 1975, and on May 3, 1975 there was a meeting between three of the employees and management.

Between May 5 and May 11, 1975, all 17 employees returned to work. Prior to their return, the residents had been cared for by executive, administrative, and professional staff. Between May 1, and May 21, 1975, 24 residents were relocated to other facilities.

On May 7, 1975, the Union petitioned for a Board election and certification as the employees' collective bargaining representative.

On May 9 and May 11, 1975, Long Beach notified the 17 employees that their employment was terminated for "child neglect and abandonment of duties in a health care facility." The Union filed unfair labor practice charges on behalf of the terminated employees.

The election was held, with the ballots of the 17 terminated employees challenged. If these ballots were counted, the Union would win the election; if not counted, the Union would lose. The challenge to the election was consolidated with the unfair practice charge, hearing before an administrative law judge was waived, and the consolidated case accepted by the Board on stipulated facts.

The Board found that Long Beach violated § 8(a)(1) of the Act [29 U.S.C. § 158(a)(1)] by firing the employees for engaging in protected concerted activities. Specifically the Board found that employees, as distinguished from labor organizations, are not required to give notice of a work stoppage under § 8(g) [29 U.S.C. § 158(g)] and that the employees here did not constitute a labor organization. Since the employees had been wrongfully terminated, their ballots should have been counted in the election. As a remedy the Board ordered the employees reinstated with back pay, their ballots counted and the election results certified, and the posting of the usual notices.

The Board now seeks enforcement of its order. Long Beach has cross-appealed for review.

---

* Honorable Robert M. Takasugi, United States District Judge, Central District of California, sitting by designation.

 It is well settled that work stoppages in protest of working conditions, even by unorganized employees, are protected by § 7 of the Act [29 U.S.C. § 157]. *N. L. R. B. v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); *N. L. R. B. v. Robertson Industries*, 560 F.2d 396 (9th Cir. 1976). The facts of this case clearly show that the 17 employees were terminated for engaging in such protected activities; the Board's conclusion that Long Beach violated § 8(a)(1) of the Act is therefore supported by substantial evidence and should be affirmed.

Long Beach makes a two pronged argument in response. First, it claims that § 8(g) of the Act required the employees to give 10 days notice of the work stoppage, and the failure to give such notice rendered the work stoppage illegal and therefore deprived the employees of the protection of the Act under § 8(d). Second, Long Beach claims that even if § 8(g) is interpreted to mean that only labor organizations are required to give the 10 days notice, the employees here had formed themselves into a labor organization. The Union, which has been granted leave to intervene, claims that even if the above arguments are accepted, Long Beach nevertheless may have condoned the unprotected activity by allowing the employees to return to work, and the case should be remanded to the Board for findings on this point.

 This court has recently held that § 8(g) applies only to labor organizations, not to unorganized employees, *Kapiolani Hospital v. N. L. R. B.*, 581 F.2d 230 (9th Cir. 1978). We agree with the reasoning of that case. *Kapiolani* also disposes of Long Beach's argument that the employees lost their protected status under § 8(d) by striking within the notice period. If there was no § 8(g) violation, there can be no loss of status under § 8(d). *Kapiolani, supra*, at 234 n.1.

 Long Beach contends that, if § 8(g) is construed to apply only to labor organizations, the 17 employees here were a labor organization within the meaning of § 2(5) of the Act, [29 U.S.C. § 152(5)] which provides,

The term "labor organization" means any organization of any kind, or any agency, or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

Whether a particular group is a labor organization is a question of fact, and the Board's finding should be upheld if supported by substantial evidence. *N. L. R. B. v. Cabot Carbon Co.*, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959). The facts here are very similar to those in *N. L. R. B. v. Buzza-Cardozo*, 205 F.2d 889 (9th Cir. 1953) *cert. denied* 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417 (1954), where the court found no labor organization existed. In light of the facts here that the employees all signed Union authorization cards contemporaneously with the "organizational" meeting, that no committee was formally designated, and that this meeting occurred after the work stoppage began, the Board's view that the employees were not a labor organization seems well supported and will be upheld.

ENFORCED.