EAST CHICAGO REHABILITATION
CENTER, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 82–1129.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 3, 1983.

Decided June 27, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 24, 1983.

Paul Jordan Cherner, Friedman & Koven, Chicago, Ill., for petitioner.

Elaine Patrick, N.L.R.B., Washington, D.C., for respondent.

Before POSNER and COFFEY, Circuit Judges, and NEAHER, Senior District Judge.*

POSNER, Circuit Judge.

This petition to set aside the Labor Board's order finding that a nursing home committed an unfair labor practice in firing striking employees requires us to consider the rights of health-care employees to engage in concerted activity for mutual aid or protection in light of sections 7, 8(g), and 9(a) of the National Labor Relations Act, 29 U.S.C. §§ 157, 158(g), 159(a).

The East Chicago Rehabilitation Center provides round-the-clock intensive nursing care to some 116 patients. In December 1978, after a representation election, a local of the retail clerks union was certified as the collective bargaining representative of the Center's service and maintenance employees. In February 1979 it began negotiating with the Center for a collective bargaining agreement. During the negotiating session on June 11, Henderson, a part-owner of the Center and one of its negotiators, happened to mention that the Center permitted its employees to leave the premises during their paid lunch break. A consultant to the Center who was participating in the negotiation interjected that the Center would be liable under workmen's compensation law for any injury an employee sustained off the premises during a paid break, whereupon Henderson stated that the Center would have to stop letting its employees leave the premises for lunch. The union negotiators objected to such a change, especially when the parties were close to agreement on a contract. But Henderson was adamant, and a few days later, without notice to the union, the Center circulated a memorandum to its employees informing them that effective June 18 all employees would have to remain on the premises during lunch and that failure to comply with this directive would result in immediate termination.

The employees on the first shift (7:00 a.m. to 3:00 p.m.) received the memorandum at the start of the shift on June 15. They immediately gathered in small groups in the halls, discussing the change. Management got wind that they were upset and held two meetings with them that morning to explain the reason for the change of policy. After the second meeting ended, 17 of the employees decided to walk out in protest against the change. The union found out about the walkout, and its representatives immediately got in touch with the striking workers (who were either still in the Center or just outside), told them they should not have walked out and that

---

* Honorable Edward R. Neaher of the Eastern District of New York, sitting by designation.

the union would not sanction their strike, and asked them whether they were willing to go back to work. They said they were and the union immediately conveyed this message to the Center's management. But the Center refused to reinstate them, even temporarily, and instead suspended them till such time as its board of directors could meet to decide whether to fire them; and they went home. Although the exact chronology of the morning is unclear, it appears that two hours elapsed between the walkout by the 17 employees and the decision to suspend them.

The negotiations for a collective bargaining contract concluded successfully on June 18. The contract converted the lunch hour into unpaid time, so that the employees could leave the premises without exposing the Center to liability. In lieu of the paid lunch break they received two paid coffee breaks (described by the administrative law judge as two 20-minute lunch breaks, but he must have meant coffee breaks).

On June 20 the Center fired the 17 employees who had walked out on June 15. The Board then brought unfair labor practice proceedings against the Center, and after a hearing concluded that the Center had violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by firing the 17 workers—their strike being, in the Board's view, activity protected by section 7. The Board therefore ordered the workers reinstated with back pay.

■ A strike to protest a change in working conditions is within section 7's broad definition of protected activity. But the Center argues that the strike in this case was taken out of section 7 by other provisions of the Act, notably sections 9(a) and 8(g), and by the judge-made rule that denies the protections of section 7 to abnormally destructive strikes.

■ Section 9(a) makes the "representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes ... the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment ...." Thus, if the 17 workers had been striking to enforce a demand that the company bargain with them, rather than with the union, over where they could eat lunch, the strike would not have been protected by the provision in section 7 that "employees shall have the right ... to bargain collectively through representatives of their own choosing ...." But that is not what the workers were doing. Their spontaneous, unorganized walkout in protest against the company's unilateral change in the conditions of their employment was not an effort to butt their way into the bargaining process but an instance of what section 7 protects under the rubric of "other concerted activities for the purpose of ... mutual aid or protection."

Thus this case is not like *Emporium Capwell Co. v. Western Addition Community Organization,* 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975), where a group of employees, dissatisfied with the union's representation, expressed "their desire to deal directly with 'the top management' of the Company over minority employment conditions, announced their intention to picket and institute a boycott of the store" to enforce this demand, and "were discharged for attempting to bargain with the Company...." *Id.* at 55, 60, 95 S.Ct. at 981, 983–84. It is not like *Harnischfeger Corp. v. NLRB,* 207 F.2d 575, 578 (7th Cir.1953), where "a comparatively small number of discontented employees undertook by a work stoppage or strike movement to take charge of and direct the actions of their chosen bargaining representative in negotiation with their employer as to the terms of employment." The Center's workers expressed no dissatisfaction with the union and no desire to take negotiations into their own hands. They merely wanted to show how angered they were by the unilateral change in the lunch rules. It is not like *Food Fair Stores, Inc. v. NLRB,* 491 F.2d 388, 394 (3d Cir.1974), where the strike "was carried out against the wishes of the Union," violated the collective bargaining agreement, and "was in

part to protest against certain substantive portions of the agreement concerning seniority to which the union had assented." The union here did not assent to—it protested—the change in the lunch rules; the strikers were not even aware that the change was under discussion in the collective bargaining sessions between the union and the employer; and when told by the union to return to work the strikers immediately agreed. By demonstrating to the union the passions that had been aroused by the new lunch rule, the strike led the union to demand that the employer rescind the rule, and in effect he did, by converting the paid lunch hour to unpaid leave (with compensating concessions so that the workers were not worse off); and there is no evidence that in demanding rescission the union was merely yielding to pressure from a vocal minority and giving up alternative demands more important to the bargaining unit as a whole.

■ The fact that the union told the workers to go back to work does not prove that the strike undermined the union's performance of its collective bargaining function. The union *had* to repudiate the strike. Otherwise it might have been held to have ratified it, which would have made the strike an unprotected activity and thereby cost the strikers their jobs. Section 8(g) of the Act provides that "a labor organization before engaging in any strike ... at any health care institution, shall, not less than ten days prior to such action, notify the institution in writing ...," which was not done here; and a strike unlawful under section 8(g) is not protected by section 7. See section 8(d), 29 U.S.C. § 158(d).

■ To hold as the petitioner would have us hold that all wildcat strikes (i.e., strikes not authorized by the strikers' collective bargaining representative) are unprotected, regardless of circumstances, might be an advance in the theory and practice of industrial relations—though one that can be attained at the level of the individual bargaining unit by writing a no-strike clause into the collective bargaining agreement. But it would not be good law. Although it

has been said that "wildcat concerted activities are unprotected and render the participants susceptible to discharge," Gorman, Basic Text on Labor Law 311 (1976), the facts of the cases Professor Gorman relies on show that his generalization cannot be sustained. Most are cases where, as in *Harnischfeger* and *Food Fair Stores,* the wildcat strikers were trying to take over the collective bargaining function from the union. *NLRB v. Draper Corp.,* 145 F.2d 199 (4th Cir.1944), the original anti-wildcat case, was such a case. The day before the union was to meet with the company to negotiate a collective bargaining agreement, the company's representative got sick, and the meeting was cancelled by mutual agreement. A group of employees "thought that his illness was feigned as an excuse for delay and became angry and resentful," and they went out on strike because "they considered that the company was 'stalling' and ... they wanted 'action' and would get it." *Id.* at 201. They were striking as much against the union as against the employer. Thus, as we said in *NLRB v. Kearney & Trecker Corp.,* 237 F.2d 416, 420 (7th Cir. 1956), *Draper* and *Harnischfeger* stand for the proposition that "when the minority group attempts to control the actions of the majority, its action is not protected," and that is not this case. *NLRB v. Sunbeam Lighting Co.,* 318 F.2d 661, 662 (7th Cir. 1963), and *Lee A. Consaul Co. v. NLRB,* 469 F.2d 84, 85 (9th Cir.1972) (per curiam) ("a five day wildcat strike, viewed as such by both the employers and the union"), are distinguishable on the same basis, while *NLRB v. Tanner Motor Livery, Ltd.,* 419 F.2d 216 (9th Cir.1969), another in the *Draper* line, is like *Emporium Capwell.* The best case for the petitioner is *NLRB v. Shop Rite Foods, Inc.,* 430 F.2d 786 (5th Cir.1970), but the court in *Shop Rite* stated, "We do not hold that there cannot be circumstances in which an employee or a minority group of employees may engage, without reference of the matter to union processes, in action which is protected under Section 7 though there is an agreement in force or in the process of negotiation." *Id.* at 791. The strike was planned, and lasted

at least 18 days. The brief spontaneous walkout in this case is within the area of wildcat activity the lawfulness of which was left open in *Shop Rite.*

The controlling cases here are none that we have discussed. They are, rather, *NLRB v. A. Lasaponara & Sons, Inc.,* 541 F.2d 992, 998–99 (2d Cir.1976), where "there [was] no evidence that the Palm Sunday strikers were at odds with or attempting to by-pass their union," though the court also noted that the strike may actually have been authorized by the union, *id.* at 999; and our own circuit's decision in *Jones & McKnight, Inc. v. NLRB,* 445 F.2d 97, 105 (7th Cir.1971), which points out that "the fact that none of the strike activity was sanctioned by the Union is of no import.... By authorizing a bargaining agent to represent them, the employees cannot be said to have waived all rights to protect themselves against an employer's unlawful actions, since their individual action in such circumstances is not an attempt to undermine their representative's position, but to protest the employer's circumvention of the policies of the [National Labor Relations] Act." The company's action in this case in unilaterally—one might even say, provocatively—changing the conditions of employment while the union was bargaining collectively—indeed, only three days before the contract was signed—may likewise have been a "circumvention of the policies of the Act," although no section 8(a)(5) charge was filed. *Western Contracting Corp. v. NLRB,* 322 F.2d 893, 899 (10th Cir.1963) (alternative holding), is like *Jones & McKnight,* while another decision of this circuit, *Dreis & Krump Mfg. Co. v. NLRB,* 544 F.2d 320, 326–27 (7th Cir.1976), holds, consistently with all the precedents, that not all wildcat concerted activity is outside the protection of section 7.

Section 7 is broadly worded—deliberately so. See, e.g., *Eastex, Inc. v. NLRB,* 437 U.S. 556, 565–68, 98 S.Ct. 2505, 2512–14, 57 L.Ed.2d 428 (1978); *NLRB v. Browning-Ferris Industries,* 700 F.2d 385, 386–88 (7th Cir.1983). Although section 9(a) qualifies section 7, it qualifies the part of section 7 that gives workers the right to bargain collectively. It does not—not explicitly anyway—qualify their section 7 right to engage in other concerted activities for mutual aid or protection. Unless, therefore, a wildcat strike is called for the purpose of asserting a right to bargain collectively in the union's place or is likely, regardless of its purpose, to impair the union's performance as exclusive bargaining representative, section 9(a) does not put the strikers beyond the pale of section 7. That is the natural reading of sections 7 and 9(a), the reading most consistent with section 13, 29 U.S.C. § 163, which provides that "nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike ...," the reading by the Board, and the reading that makes the most sense out of the case law.

Still, there may be enough play in the joints to allow new law to be made in this area. If the Board were to hold that wildcat strikes are per se in derogation of the union's role as exclusive bargaining representative—pointing out, as it could, that any concerted activity is an implicit demand for company action and is therefore inherently inconsistent with the union's exclusive role—we would give its views respectful attention. But the Board rather than the courts should be the innovator. It can reconcile the policies of section 7 with those of section 9(a), can harmonize the Act's discordant themes of the rights of employees as individuals and the rights of unions as collectivities, better than we—who maybe cannot do it at all. We have no guides to judgment in this area. Although the concept of administrative agency expertise has a large fictive component, there is no denying that the Board knows more than we do about the impact of wildcat strikes on unions and employers; and we are not much worried that the Board's all too frequent bias toward unions will prejudice it in this area against employers, since a wildcat strike will often (the petitioner would say always) hurt the union as well as the employer. Therefore, if the Board chooses to

distinguish between wildcat strikes that undermine the union's position as exclusive collective bargaining representative and ones that do not, as it did in this case and has done in others, see, e.g., *Sunbeam Lighting Co.,* 136 N.L.R.B. 1248, 1253–55 (1962), enforcement denied, 318 F.2d 661 (7th Cir.1963); *R.C. Can Co.,* 140 N.L.R.B. 588, 595–96 (1963), enforced, 328 F.2d 974 (5th Cir.1964), we must let it.

Of course, even if section 9(a) does not exclude the striking workers from the protection of section 7, section 8(g)—the 10-day notice provision mentioned earlier—may. But that section applies only to strikes by "labor organization[s]." The petitioner argues that the purpose of the 10-day notice requirement would be defeated if workers could get around it simply by striking without their union's authorization. The argument has merit but is addressed to the wrong body. Even a judge who was not a literalist in statutory interpretation, and who disregarded section 13 of the Act, and the pointed warning by Senator Harrison Williams, a sponsor of the 1974 Health Care Amendments, that "this legislation is the product of compromise, . . . and the Labor Board should use extreme caution not to read into this Act by implication—or general logical reasoning—something that is not contained in the bill, its report and the explanation thereof," 120 Cong.Rec. 22575 (1974), and the explicit and as we shall see restrictive definition of labor organization in section 2(5), 29 U.S.C. § 152(5), would be hard-pressed to interpret section 8(g) as if the words "labor organization" did not appear. True, one of the sponsors of the bill that added this section to the Act, Senator Robert Taft, Jr., stated on the floor that "it would not be protected activity for employees acting without a labor organization to engage in a work stoppage . . . without giving the required notice," 120 Cong.Rec. 12945 (1974); but there is no indication that any other member of Congress agreed with his statement.

The statute is not irrational when read, as it is written ("a labor organization before engaging in any strike . . . shall . . ."), to limit the notice requirement to strikes called by organizations—which will usually mean, by unions. Such strikes, at least if called without notice, generally are more costly than wildcat strikes. A union-authorized strike is apt to last longer, involve more workers, and command more support from other unions than a wildcat strike (though wildcat strikes, especially if protected by section 7, may be more frequent). This strike involved only one-third of the workers on only one of the employer's three shifts, lasted only two hours, and so far as appears was not part of a pattern of wildcat activity at the Center.

■ Every other decision has read section 8(g) to mean what it says: the notice requirement is applicable only if the strike is by a labor organization. See *Montefiore Hospital & Medical Center v. NLRB,* 621 F.2d 510, 514–15 (2d Cir.1980); *NLRB v. Long Beach Youth Center, Inc.,* 591 F.2d 1276, 1278 (9th Cir.1979); *NLRB v. Rock Hill Convalescent Center,* 585 F.2d 700, 701 (4th Cir.1978). We consider these decisions authoritative in this case even though they involved strikes at nonunion facilities, and when a facility is unionized (as the Center is) it is difficult to distinguish between a truly unauthorized strike and "a wink and a nod" strike encouraged by the union to evade the requirement of advance notice. That is an issue in this case, as we shall see. But to rewrite section 8(g) so that it reads, "if a health-care facility is unionized any strike, whether or not called by a labor organization, must be preceded by 10 days' written notice," would exceed the permissible limits of judicial creativity, when nothing in the background of the statute indicates that we are licensed to take it other than at face value.

■ This assumes, it is true, that wildcat strikes were not considered per se unlawful in 1974, when section 8(g) was enacted; for if they had been, there would have been no occasion to require advance notice for wildcat strikes. But if we have interpreted the case law correctly, in 1974 as today wildcat strikes were not per se unprotected. And while the important thing is

not what we think today but what Congress thought in 1974, the legislative history of the Health Care Amendments contains no suggestion that Congress thought that wild-cat strikes were per se unprotected and only for that reason failed to extend the 10-day notice requirement to them expressly.

■ The petitioner makes two other arguments under section 8(g), and though the first is inconsistent with its section 9(a) argument that does not make it wrong, now that we have rejected that argument. The first argument is that the strike, far from being in derogation of the union's role as the exclusive collective bargaining representative, was authorized by the union and was therefore a walkout by a labor organization to which the 10-day notice requirement of section 8(g) applied by its terms. The principal evidence of union authorization is that one of the leaders of the walkout was a union steward. The Board could and did find this evidence overborne by a mass of direct evidence that the union did not authorize the strike and tried to stop it as soon as it found out about it.

■ The second argument is that the 17 striking workers comprised an informal labor organization. Section 2(5) of the Act, 29 U.S.C. § 152(5), defines "labor organization" as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." There is no requirement of formality—no requirement that the "labor organization" be recognizable as a union—but there must be an organization, such as the employee committee in *Pacemaker Corp. v. NLRB,* 260 F.2d 880, 883 (7th Cir.1958), and one of its purposes must be bargaining with an employer. In *Long Beach Youth Center, Inc., supra,* 591 F.2d at 1278, there was purpose but no organization, and that was held not to be enough. In this case the 17 spontaneously striking workers had neither the organization nor the purpose, and they were there-

fore not a labor organization. If any concerted activity by workers—however spontaneous, ad hoc, and unstructured—were the activity of a "labor organization," section 8(g) would require advance notice of any walkout by two or more workers acting in concert, and the limitation that Congress appears to have intended when it required advance notice only of a strike by a labor organization would be undone.

■ The petitioner's final argument is that the walkout was unprotected because it endangered the health of the nursing home's patients. Section 7 has been interpreted not to protect concerted activity, whether incident to a strike or otherwise, to destroy property or endanger life or limb. See, e.g., *NLRB v. Marshall Car Wheel & Foundry Co.,* 218 F.2d 409, 413 (5th Cir. 1955). But more must be shown than that the activity caused inconvenience. The whole purpose of a strike is to impose costs on the employer, in the hope of making him come to terms; and an effective strike, by preventing the employer from serving his customers, necessarily imposes costs on them as well: it forces them either to turn to other suppliers of the goods or services sold by the employer (thus denying them their first choice) or, as in this case, to do without for a time.

■ Thus the Board in this case had to decide whether the strike merely caused inconvenience to the Center's patients or whether it endangered them. See, e.g., *Montefiore Hospital & Medical Center, supra,* 621 F.2d at 516. The administrative law judge found that the strike had "creat[ed] serious patient care problems," but did not find any actual danger to health and concluded that the strike was protected activity. The Board found that "although some patient care schedules were not completely adhered to, there is no showing that the strike jeopardized any patient's safety or health," noting that "once the strikers offered to return to work they could not be held responsible for any subsequent interruption in normal patient servicing." Our job is to decide whether these findings are supported by substantial evidence on the

record as a whole. The strongest evidence is that when management learned that the workers were willing to resume work immediately it refused to take them back. Unless the Center wanted to be prosecuted for criminal neglect it would not have done this if there were danger to its patients. It did not have to suspend the strikers on the spot even to preserve its claim to have a right to fire them for engaging in unprotected activity, for without any prejudice to its being able to fire them later it could have reinstated them temporarily till it lined up replacements, provided only that it made its intentions clear when it reinstated them.

It must be, therefore, that the Center could operate safely for several days without the 17 striking workers (that, or its management was behaving recklessly); if so, then it could operate safely for a few hours without them. No doctors or nurses walked off—only nurse's aides, orderlies, and maintenance workers, and not all of the employees in these categories, either. Although there was delay in serving patients breakfast, giving them their medications, and changing their sheets—a hardship, obviously, to incontinent patients, and there were some—and although the sudden disappearance of the customary staff caused anxiety to some patients, no one was put in danger or subjected to acute distress, nor were such consequences likely from so short and incomplete a walkout of nonprofessional workers. The fact that the strike caused a delay in removing the body of a patient who had died (there is of course no suggestion that this death was caused or hastened by the strike) adds to the unpleasantness of the episode, but the very emphasis the petitioner places on this fact highlights the difference between a nasty strike and a dangerous strike.

▮ The judge-made exception to section 7 for intolerably destructive concerted activity is illustrated by *NLRB v. Reynolds & Manley Lumber Co.*, 212 F.2d 155, 158 (5th Cir.1954), where a worker walked off the job and left boilers unattended, which "undoubtedly created a very dangerous situation and was a violation of positive instructions that it should never be done. He must have known, since he had worked for the company many years at different times, that in 1945 a fire had broken out under similar conditions, resulting in a loss of some $200,000, and at that time the plant had to be shut down for some six months while the sawmill was rebuilt." The medical equivalent would be a nurse's walking out of an operating room in the middle of an operation. This would not be protected activity, nor would be the many less extreme examples that could be put involving danger to life or health, but even they would be remote from this case. Nurse's aides are not professionals and are not entrusted with critical responsibilities, and the walkout was of short duration. Although at some point the cumulative distress to helpless patients caused by a walkout of nurse's aides might cross the line that separates inconvenience from inhumanity, the evidence did not require the Board to find that it had been crossed in this case. Nevertheless this is a close case, and the Board might well have gone the other way.

▮ A finding that concerted activity is protected by section 7 does not condemn the employer to inaction. Protected does not mean privileged. As pointed out in *NLRB v. Browning-Ferris Industries, supra*, 700 F.2d at 388–89, the employer may take all necessary steps to keep his business running smoothly—may hire permanent replacements and so on. But he cannot operate with a completely free hand as he tried to do here. It might be better for society if he could but we think Congress has decided otherwise, and we are bound however reluctantly by its decision.

The Board's order will be

ENFORCED.

COFFEY, Circuit Judge, dissenting.

I am compelled to dissent as I cannot agree with the conclusion of the NLRB and the majority that, in participating in an unauthorized "wildcat" strike at a skilled nursing care facility, the 17 Rehabilitation Center employees were engaging in protect-

ed concerted activity. The majority's holding, concentrating solely on the interests of employees to the exclusion of the interests of the employer as well as the public, makes a mockery of Congress' intent to strike a fair balance between the conflicting interests of employers and employees. The majority's holding is even more disturbing as it involves a "wildcat" strike in the health care field, where the health, welfare and safety of infirm and dying patients are directly threatened by sudden interruptions in physical and medical assistance. Like police and fire departments, health care facilities, whether they be hospitals, nursing homes or psychiatric care institutions, play a vital role in preserving our society's health and well-being and, therefore, the rights of patients and the public to receive uninterrupted services becomes critically important in cases dealing with "wildcat" strikes in the medical field. Judge Posner's cold and detached analysis treats this case as though we were considering a walkout occurring on an assembly line, in a steel mill or in a coal mine, where at most an interruption in production would result. Rather, I dissent as I believe it is important to emphasize that this walkout occurred in the health care field, where human lives are all too frequently hanging in the balance. Moreover, I would hold that the 17 employees who walked off their jobs constituted a "labor organization," and thus were required to give 10 days notice prior to any work stoppage or strike. Finally, I disagree with the majority's decision because, in holding that this "wildcat" strike was protected activity, the majority disregards an overwhelming weight of prior case law.

## I.

It is axiomatic that Congress' goal in enacting the National Labor Relations Act was to strike a fair balance between the interests of employers and employees. As the Supreme Court has often stated:

"The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which

the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review."

*NLRB v. Truckdrivers,* 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957). In this case, the majority had blindly accepted the NLRB's so-called "balance" by cavalierly stating that the NLRB "can reconcile the policies of section 7 with those of section 9(a), can harmonize the Act's discordant themes of the rights of employees as individuals and the rights of unions as collectivities, better than we—who maybe cannot do it at all."

I cannot join with the majority in affording excessive deference to the NLRB in this case since "whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the courts of appeals." *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 507, 98 S.Ct. 2463, 2477, 57 L.Ed.2d 370 (1978). Rather, we must bear in mind the District of Columbia Circuit's words in *Service Emp. Intern. U. v. NLRB,* 600 F.2d 930, 939 (D.C.Cir.1979) regarding the proper role of the courts of appeals in reviewing the decisions of the NLRB:

"We are not unmindful of the fact that there is only limited judicial review of [NLRB] findings but the Supreme Court in *Labor Board v. Brown* [380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965)] ... pointedly stated that the phrase 'limited judicial review' did *not* mean that the balance struck by the Board was immune from judicial examination and reversal in proper cases, and 'where, as here, the review is not a question of fact, but of judgment as to the proper balance to be struck between the conflicting interests, *the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.'*" (emphasis added).

By falling into judicial inertia, Judge Posner has in his reasoning in this case effec-

tively rendered the NLRB "immune from judicial review" and has ignored the "undisputed right of employers to maintain discipline in their establishments." *Eastex, Inc. v. NLRB,* 437 U.S. 556, 571, 98 S.Ct. 2505, 2515, 57 L.Ed.2d 428 (1978). Courts must not abdicate their responsibility and become, in effect, merely rubber stamps for the decisions of the NLRB, particularly where the NLRB decision concerns "judgment as to the proper balance to be struck" in a fact situation involving the very well-being of the sick, weak, infirm and dying in a nursing home or hospital facility.

Furthermore, the excessive deference afforded by the majority to the NLRB is particularly injudicious since this case involves a "wildcat" strike in the health care field which, like police and fire departments, provides vital services, rather than in the usual industrial setting with which the NLRB is more accustomed and has accumulated a certain expertise. As the Supreme Court stated in *Beth Israel Hospital,* 437 U.S. at 508, 98 S.Ct. at 2477, *quoting NLRB v. Beth Israel Hospital,* 554 F.2d 477, 481 (1st Cir.1977):

> "Hospitals carry on a public function of the utmost seriousness and importance. They give rise to unique considerations that do not apply in the industrial settings with which the Board is more familiar. The Board should stand ready to revise its rulings if future experience demonstrates that the well-being of patients is in fact jeopardized."

Similarly, Justice Blackmun, in his concurrence in *Beth Israel Hospital,* eloquently described the unique characteristics of the health care field:

> "Hospitals, after all, are not factories or mines or assembly plants. They are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activities, and where the patient and his family—irrespective of whether that patient and that family are labor or management oriented—need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed."

*Id.* 437 U.S. at 509, 98 S.Ct. at 2477.

Nevertheless, Judge Posner in this case glosses over the suffering, severe emotional strain and potential danger the patients were subjected to as a result of the wildcat strike. First, the majority summarily concludes that the wildcat strike of the 17 employees "merely caused inconvenience." However, an examination of the facts in the record discloses that the disruption in patient care was far more serious than "merely inconvenience." Of the 116 patients at the Rehabilitation Center, more than 58 were unable to care for themselves, being either paraplegics, hemiplegics, blind, incontinent and/or having to be fed with tubes inserted through their noses and throats. The duties of the nurse's aides who walked off their jobs consisted of feeding the patients, including those who received nutrition through tubes, transferring paralyzed patients, assisting those incontinent patients and in general making them all as comfortable as possible under the most trying circumstances. After the walk-out of the 17 employees, the Center's usual on-duty nursing staff of 19 was reduced to only two nurse's aides and four nurses to perform these important duties for the 116 patients.

The majority further misconstrues the record by stating "no one was put in danger or subjected to acute distress, nor were such consequences likely from so short and incomplete a walkout of non-professional workers." Once again, the record paints a vastly different picture. For example, the Center Administrator described the effects of the walkout as follows:

> "Q. What major problems, if any, did you observe?
>
> "A. There was one patient that had expired.
>
> "Q. Died?
>
> "A. Yes. The body just laid there. I don't know when the body finally got out but it was just laying there.

"Q. What would have normally happened had there been a full work force?

"A. The body would have been dressed and prepared and the undertaker notified, the physician and undertaker notified and the body would have been removed.

"Q. Was this dead patient in a room by him or herself or in a room with somebody else?

"A. I don't know.

"Q. Do you generally have two people to a room?

"A. Yes."

*    *    *    *    *    *

"There was a big lapse in patient care when the walkout happened and the patients didn't understand what was going on. The type of patient that we have are skill level and out of the three different types of levels of care residential, intermediary and skills, skills being the most critical of the three patients. Those are the type of patients that we service.

"Many of the patients can't feed themselves. They can't get up by themselves. When the employees walked off, we had patients that were not fed and they couldn't feed themselves. The food was sitting there but they couldn't feed themselves. The food was cold when they did get it. Patients were laying in urine and feces until we could get the supervisors together to go out there to the floor."

*    *    *    *    *    *

"A. [The patient's food] was taken to the floor but I found out later that the problem didn't just start when [the striking employees] requested the meeting but earlier when they first came to work. The work hadn't been done from that period on either. There was a very minimal amount of work done that particular day and so the work that should have been done, like patients being showered, patients weren't even showered and the stench was just all over the facility.

"Q. What difference does that make in terms of patients being showered? What problems were there?

"A. The patients developed bedsores, rashes and all types of problems. A lot of the patients there, because of their physical condition, have a worse body order [sic] than what you would term as the normal person and, of course, you still have the people laying in feces and urine.

"Q. How many people were in that condition?

"A. There were many numbers, at least that I observed personally, maybe about 20, 25. They were just laying there until the supervisors could get to them or whoever could get to them."

Furthermore, Metta Stone, who as Nursing Supervisor in charge of the nurses aides was responsible for supervising the care of the Center's patients, testified that the day of the walkout was "the worst day of [her] life." Not surprisingly, the Administrative Law Judge, after hearing all of the witnesses, found that the "wildcat" strike, and the resulting reduction in on-duty nursing staff caused a *"substantial disruption in the normal operations of the facility and create[d] serious patient care problems."* The majority and the NLRB completely disregard this finding of the trier of fact (the ALJ) based on direct, positive testimony, in order that they might selectively analyze the record to reach their desired result. *See NLRB v. Cutting, Inc.,* 701 F.2d 659, 665 (7th Cir. 1983). Furthermore, the NLRB violated the Supreme Court's directive in *Beth Israel Hospital,* 437 U.S. at 508, 98 S.Ct. at 2477 that "the Board should stand ready to revise its rulings if future experience demonstrates that the well-being of patients is in fact jeopardized," as it was in this case.

Despite the ALJ's finding that the walkout "create[d] serious patient care problems," and despite the overwhelming testimony that the walkout resulted in severe hardship and potential danger to the Rehabilitation Center's patients, the NLRB and the majority conclude that the patients experienced only "mere inconvenience." However, I would hold that the patients were subjected to far more than "mere inconvenience" since the record shows that patients were not fed on time (certainly

more than a "mere inconvenience" to patients receiving nutrition through tubes), and patients had to lie in their own excrement until supervisory personnel could attend to them, causing the development of bedsores and rashes. Nevertheless, Judge Posner concludes that the walkout resulted in "mere inconvenience," stating that "the strongest evidence is that when management learned that the workers were willing to resume work immediately it [the management] refused to take them back." This reasoning is specious for two reasons. First, because of the emergency created by the walkout, the Center management was forced to transfer supervisory and clerical personnel to patient care duties. When the striking employees finally offered to return to their jobs the fill-in supervisory and clerical employees had brought the situation under control, though the level of care was still well below that normally provided by the Center, since there were only two nurses aides and four nurses then on-duty, a ratio of approximately one nursing employee for every nineteen patients (not including the patient that died on that date). The record clearly demonstrates that the most serious disruptions in patient care occurred entirely during the period of the walkout, before the wildcat strikers offered to return to their jobs at the direction of their union.

More importantly, there is no reason why the Rehabilitation Center management should be required to allow the "wildcat" strikers to return to work. No employer should be required to employ workers who demonstrated such cold and callous disregard for sick and weak human beings entrusted to their care by abandoning seriously ill patients and walking off their job over something as insignificant as being required to eat lunch on the premises. What assurance does the Rehabilitation Center management have that the employees will not again cavalierly walk off the job in the future any time they might disagree with their employer over some matter of trivial importance compared to plight of the sick and helpless patients? In refusing to reinstate the wildcat strikers, the Rehabilitation Center management was acting well within its right and, in fact its duty, to ensure that it had a dependable workforce to provide uninterrupted care for the seriously ill patients; hospitals and nursing homes are entitled to have a sympathetic, dedicated and concerned workforce. The striking workers did not leave an assembly line, a steel mill or a mine unattended—rather, they left sick and helpless human beings desperately in need of care. Each year this nation's health care facilities spend billions of dollars on sophisticated medical research and technology, which are useless if for any reason the health care personnel decide to stage a "wildcat" walkout and abandon their sick and dying patients. Nonetheless, Judge Posner today allows health care workers to abandon helpless patients without 10-days advance notice, in fact without so much as a moment's notice, over even the most trifling dispute with their employer.

We must bear in mind that the NLRB and the courts have applied the same legal standards to all health care facilities, without making necessary distinctions between the differing needs of hospitals, psychiatric wards or nursing homes. *See, e.g., Montefiore Hospital & Medical Center v. NLRB,* 621 F.2d 510 (2d Cir.1980) (hospital); *NLRB v. Long Beach Youth Center, Inc.,* 591 F.2d 1276 (9th Cir.1979) (psychiatric facility); *NLRB v. Rock Hill Convalescent Center, Inc.,* 585 F.2d 700 (4th Cir.1978) (nursing home). Thus, the majority's decision sanctioning a "wildcat" strike in a nursing home creates a dangerous precedent for all health care facilities, including hospitals. Although the majority concedes the obvious—that the Act would not allow a nurse to walk out of an operating room in the middle of an operation—the majority's decision sanctioning a "wildcat" strike in a nursing home leaves the door open for future wildcat strikes in health care facilities. Under the majority's holding today, would a nurse be permitted to abandon her duties in an emergency room, or would workers be entitled to walk off the job at a psychiatric institution, leaving mentally ill, and poten-

tially dangerous patients, without care, supervision, medication or food?

## II.

I would hold that the 17 employees violated section 8(g) of the Act (29 U.S.C. section 158(g)) in walking off the job without prior notification and thus the Rehabilitation Center management acted lawfully in discharging the employees. Section 8(g) provides that "a labor organization before engaging in any strike . . . at any health care institution shall, not less than ten days prior to such action notify the institution in writing." It is undisputed that the strikers in this case did not give the Rehabilitation Center ten days notice prior to walking off their jobs; in fact, they gave the Rehabilitation Center *no* notice whatsoever. Nevertheless, the majority holds that the walkout was protected since section 8(g) applies only to "labor organizations" and, in their view, the 17 employees were not a labor organization. In so holding, the majority has carved out a dangerous loophole for health care personnel including those working in hospitals, permitting them to walk off their jobs at the drop of a hat over minor disputes with their employer, thus leaving helpless patients without desperately needed care.

In the Act, Congress defined "labor organization" in very broad terms, section 2(5) of the Act (29 U.S.C. section 152(5)) states:

"(5) The term 'labor organization' means *any* organization of *any* kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

(emphasis added).

Recognizing that the Act defines "labor organization" very broadly, the court in *NLRB v. Sweetwater Hosp. Ass'n,* 604 F.2d 454, 457 n. 5 (6th Cir.1979) construed the term "labor organization" as follows:

" 'Labor organization' is broadly defined in the Act and requires only an 'organiza-

tion' that 'exists for the purpose, in whole or in part, of dealing with employers' concerning specified matters. *See NLRB v. Cabot Carbon Co.,* 360 U.S. 203, 210–11, 79 S.Ct. 1015 [1020–1021], 3 L.Ed.2d 1175 (1959). Indeed, the complete absence of by-laws or a formal structure is irrelevant."

Similarly, this court in *Pacemaker Corp. v. NLRB,* 260 F.2d 880, 883 (7th Cir.1958) stated:

"The fact that there was no formal organization, by-laws, officers or dues is immaterial in determining whether it is a labor organization. This Court has held that such loosely formed committees do constitute labor organizations within the meaning of the Act."

Based on the clear language of section 2(5) and this case law, it is evident that the definition of labor organizations consists of two elements: (1) "any organization of any kind"; and (2) a "purpose, in whole or in part, of dealing with employers concerning . . . hours of employment or conditions of work." The group comprised of the 17 employees who walked off their jobs satisfies both these elements. First, the 17 employees as of the time the walkout occurred, comprised an "organization" since they had already held two meetings, one in the hallways as soon as the lunch period notice was distributed and the other in the Center's lunch room, before reaching a collective decision to walk off their jobs. The group joined together for the common purpose of protesting the new lunch period policy, collectively decided to walk off the job, gathered as a group outside the facility and later acceded to the common decision to return to work. The fact that the organization of 17 employees was ad-hoc is irrelevant—"The complete absence of by-laws or a formal structure is irrelevant." *Sweetwater Hosp.,* 604 F.2d at 457. Furthermore, the second definitional requirement of "labor organization" is satisfied since the 17 employees clearly had "the purpose . . . of dealing with employers concerning . . . hours of employment, or conditions of work." The sole reason the employees

banded together was to coerce their employer into abandoning its new lunch period policy, certainly a subject pertaining to hours of employment or a condition of work.

The cases cited by Judge Posner to support the conclusion that the 17 striking employees did not constitute a labor organization are inapposite to the facts of this case. For example, in *Montefiore Hospital & Medical Center v. NLRB,* 621 F.2d 510 (2d Cir.1980), the court held that *two* doctors did not constitute a "labor organization." In support of its holding, the *Montefiore* court cited, without discussion, the case of *Kapiolani Hospital v. NLRB,* 581 F.2d 230 (9th Cir.1978), which held that *one* individual employee did not comprise a "labor organization." Obviously, a lone employee cannot constitute an "organization" of any kind and it is similarly implausible to say that a group of only two employees constitutes a labor organization. However, the group of 17 employees in this case, who held two meetings prior to coming to a collective decision to walk out, is an entirely different matter. Admittedly, in *NLRB v. Long Beach Youth Center, Inc.,* 591 F.2d 1276 (9th Cir.1979), the court held that a group of 17 employees who engaged in a work stoppage did not constitute a "labor organization" within the meaning of section 8(g). Although I believe the *Long Beach Youth Center* case was decided in error since it gave an unduly narrow reading to the definition of "labor organization," the *Long Beach Youth Center* case is readily distinguishable from the instant case since in *Long Beach Youth Center* the court specifically noted in its holding that the 17 employees did not hold an "organizational" meeting until *after* the walkout, while in this case the group held two meetings before collectively deciding to walk off the job.

In giving such an unduly narrow reading to the obviously broad definition of labor organization contained in section 2(5) of the Act, the majority has created a dangerous precedent for the future. Based on the majority's decision, health care employees may now abandon their jobs in nursing homes, hospitals, emergency rooms, psychiatric institutions or intensive or intermediate care units and leave helpless patients without care, without so much as a moment's notice, over almost any dispute with their employer. The majority reaches this conclusion despite the fact that in enacting section 8(g) of the Act, Congress recognized that

> "[i]t is in the public interest to insure the continuity of health care to the community and the care and well-being of patients by providing for a statutory advance notice of any anticipated strike or picketing.... The 10-day notice is intended to give health care institutions sufficient advance notice of a strike or picketing to permit them to make arrangements for the continuity of patient care."

S.Rep. 93–766 (1974), H.R.Rep. 93–1051 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 3946, 3949. The majority's decision sanctioning wildcat strikes in the health care field will make it infinitely easier for unions to evade the 10-day advance notice requirement of section 8(g) by conducting so-called "wink and nod strikes"—a union could surreptitiously encourage a substantial number of its members to walk out, and then subsequently disavow any responsibility for the walkout. Under Judge Posner's view an employer in the health care field will be entirely without recourse in such a situation since both the union and striking employees, under the majority's reasoning, will be immune from discipline for their actions. More importantly, the majority's decision eviscerates and casts aside Congress' goal and specific intent in enacting section 8(g)'s 10-day notice provision—to prevent sudden interruptions in care to seriously ill patients.

### III.

The majority's decision ignores one of the cardinal principles of labor law: once a union has been certified as the collective bargaining representative for a group of employees, those employees are barred from bargaining with their employer independently concerning wages, hours and other

conditions of employment. Section 9(a) of the National Labor Relations Act (29 U.S.C. section 159(a)) establishes that a duly certified union enjoys the exclusive right to represent the unionized employees in matters pertaining to collective bargaining:

"(a) Representatives designated or selected for the purpose of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: ...." [1]

The importance of the exclusivity principle was recognized by the Supreme Court in *Emporium Capwell Co. v. Western Addition Community Org.,* 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975). In *Emporium Capwell,* a group of unionized employees sought to bargain directly with their employer concerning alleged discrimination against black employees, even though the relevant collective bargaining agreement contained a clause prohibiting racial employment discrimination. Rather than pursuing the union grievance procedure established by the bargaining agreement, this group of employees by-passed the union, holding their own press conference denouncing their employer's "racist" policies and established a picket line outside the employer's premises. The employer discharged the participating

employees and the National Labor Relations Board found that the employer had not committed an unfair labor practice in so doing. The Supreme Court agreed, citing a "background of long and consistent adherence to the principle of exclusive representation ...," *id.* at 65, 95 S.Ct. at 986, and stated:

"National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. *The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees.*"

*Id.* at 63, 95 S.Ct. at 985 (emphasis added), *quoting NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967).

In an earlier case, *Harnischfeger Corp. v. NLRB,* 207 F.2d 575 (7th Cir.1953), this court applied the exclusivity principle to a fact situation similar to this case. In *Harnischfeger,* while the employer and the certified union were in the process of negotiations, a group of employees walked off their jobs "to put a little heat on the [employer] and see what they were going to do." The Union had not authorized and, in fact, tried to prevent the walkout. The employer discharged some of the employees who had participated in the walkout, and this court upheld the employer's right to terminate the employees:

"[W]e are of the opinion that the 'wild cat' strike in which the employees were engaged and for which they were dis-

---

1. It is clear that the June 15 unauthorized walkout is not protected by the proviso to section 9(a) allowing employees in a bargaining unit to independently present *grievances* to the employer. First, the dispute concerning the lunch period policy was not a "grievance," but rather a collective bargaining term since the lunch period policy "fix[ed] for the future the rules of the employment for everyone in the

unit ...." *Hughes Tool Co. v. NLRB,* 147 F.2d 69, 72 (5th Cir.1945). Second, the proviso to section 9(a) does not protect a walkout, certainly a form of economic coercion, since that provision cannot "be read to authorize resort to economic coercion." *Emporium Capwell Co. v. Western Addition Community Org.,* 420 U.S. 50, 61 n. 12, 95 S.Ct. 977, 984 n. 12, 43 L.Ed.2d 12 (1975).

charged was not such a concerted activity as falls within the protection of section 7 of the National Labor Relations Act, but a strike in violation of the purpose of the act by a minority group of employees in an effort to interfere with the collective bargaining by the duly authorized bargaining agent selected by all the employees. *The purpose of the act was not to guarantee to employees the right to do as they please but to guarantee to them the right of collective bargaining for the purpose of preserving industrial peace.*"

\*　\*　\*　\*　\*　\*

"When the union was selected by the employees and recognized by the company as bargaining agent, it was understood and agreed on all sides that bargaining with respect to wages, hours and conditions of work would be carried on between the union and the company in accordance with [section 7 of the Act], that the employees would acquiesce in action taken by the union and that they would not undertake independent action with respect to the matters they had committed to it as their authorized agency. Not only did the company agree to bargain with the union, *but the employees agreed to bargain only through the union.* Those who engaged in the 'wild cat' strike violated this agreement. \*　\*　\*

"*No surer way could be found to bring collective bargaining into general disrepute than to hold that 'wild cat' strikes are protected by the collective bargaining statute.*"

*Id.* at 579 (emphasis added), *quoting NLRB v. Draper Corp.,* 145 F.2d 199 (4th Cir.1944).

Despite this clear case law, the majority seeks to justify the Board's decision in this case by distinguishing the holdings of *Emporium Capwell* and *Harnischfeger.* The majority argues that the unauthorized walkout by the 17 employees was protected activity since it was a spontaneous protest in support of union objectives, stating that "if the Board chooses to distinguish between wildcat strikes that undermine the union's position as exclusive bargaining representative and ones that do not ... *Sun-*

*beam Lighting Co.,* 136 N.L.R.B. 1248, 1253–55 (1962) *enforcement denied,* 318 F.2d 661 (7th Cir.1963); *R.C. Can Co.,* 140 N.L.R.B. 588, 595–96 (1963), *enforced,* 328 F.2d 974 (5th Cir.1964), we must let it." I disagree with this excessive deference to the Board and Judge Posner's reliance on the theory set forth in the *R.C. Can* case since that theory (distinguishing between strikes which undermine the union's position and those which do not) has been thoroughly discredited and rejected by courts and legal commentators.

Prior to 1963, courts had universally held that all "wildcat" activity was *per se* unprotected. *NLRB v. Draper Corp.,* 145 F.2d 199 (4th Cir.1944); *NLRB v. Sunset Minerals, Inc.,* 211 F.2d 224 (9th Cir.1954); *Harnischfeger Corp. v. NLRB,* 207 F.2d 575 (7th Cir.1953); Gorman, Basic Text on Labor Law 307 (1976). In 1964, however, the Fifth Circuit in *NLRB v. R.C. Can Co.,* 328 F.2d 974 (5th Cir.1964) departed from the well-settled "wildcat" principle and adopted a theory similar to the majority in this case. In *R.C. Can,* a small group of unionized employees engaged in an unauthorized "quickie strike" to pressure their employer into expediting ongoing negotiations with the union. Like the majority in this case, the Fifth Circuit distinguished the long line of prior cases finding such activity unprotected, and held that an unauthorized "wildcat" strike is protected "if ... it seeks to generate support for and acceptance of the demands put forth by the union ... so long, of course, as the means used do not involve a disagreement with, repudiation or criticism of, a policy or decision previously taken by the union ...." 328 F.2d at 979.

The rationale of the *R.C. Can* decision and the majority in this case has been *repeatedly rejected* by the other circuits. For example, in *NLRB v. Tanner Motor Livery, Ltd.,* 419 F.2d 216 (9th Cir.1969) the Ninth Circuit held that an employer acted lawfully in discharging two employees for engaging in unauthorized picketing in an effort to force their employer to hire more minority employees. In so holding, the court stated:

"We reject the rationale of *R.C. Can* . . . . *Draper* and our own decisions following *Draper* like *NLRB v. Sunset Minerals, Inc., supra,* seem more in accord with a concept of orderly bargaining premised upon democratic union processes. * * *

"In sum, we conclude that [the two employees] had an obligation to go to the union with their desire for non-discriminatory hiring. The record does not demonstrate that they approached the union, nor does it indicate that the union gave its sanction to their actions. Thus, while their concerted activity does fall within section 7, the operation of section 9(a) deprives it of the protection to which it would otherwise be entitled."

*Id.* at 221. Similarly, the Ninth Circuit in *Lee A. Consaul Co., Inc. v. NLRB,* 469 F.2d 84 (9th Cir.1972) reaffirmed its adherence to the principle that a "wildcat" strike is unprotected activity, holding that "we decline to follow *NLRB v. R.C. Can Co.* . . ." *Id.* at 85.

More recently, the Third Circuit in *Food Fair Stores, Inc. v. NLRB,* 491 F.2d 388 (3d Cir.1974) held that a "protest 'demonstration,'" in the form of an unauthorized walkout and picket by a group of employees was unprotected by the Act, and therefore the employer acted lawfully in discharging the participating employees. In so holding, the court stated:

"Nearly all of the circuits that have been confronted with this issue have followed the decision of the Fourth Circuit in *NLRB v. Draper Corp.,* 145 F.2d 199 (4th Cir.1944), *and have treated unauthorized strikes as unprotected activity per se. See Plasti-Line, Inc. v. NLRB,* 278 F.2d 482 (6th Cir.1960); *NLRB v. Sunbeam Lighting Co.,* 318 F.2d 661 (7th Cir.1963); *Harnischfeger Corp. v. NLRB,* 207 F.2d 575 (7th Cir.1953); *NLRB v. Illinois Bell Telephone Co.,* 189 F.2d 124 (7th Cir.), *cert. denied,* 342 U.S. 885, 72 S.Ct. 173, 96 L.Ed. 663 (1951); *NLRB v. Tanner Motor Livery, Ltd.,* 419 F.2d 216 (9th Cir.1969); *NLRB v. Sunset Minerals, Inc.,* 211 F.2d 224 (9th Cir.1954). This approach is supported by recent Supreme

Court decisions holding that because of the interest of Section 9(a) of the Act in a union's status as exclusive bargaining agent, some of the Section 7 rights of the employees may be exercised only in accordance with the majority choice of the union. *See Scofield v. NLRB,* 394 U.S. 423 [89 S.Ct. 1154, 22 L.Ed.2d 385] (1969); *NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175 [87 S.Ct. 2001, 18 L.Ed.2d 1123] (1967)."

*Id.* at 394 (emphasis added).

Even the Fifth Circuit, the court that originally adopted the reasoning followed by Judge Posner in this case, has severely questioned the continued validity of *R.C. Can.* In *NLRB v. Shop-Rite,* 430 F.2d 786 (5th Cir.1970), the court held that an employer acted lawfully in discharging a group of employees for participating in an unauthorized "wildcat" strike. In so holding, the court first strictly limited the applicability of the *R.C. Can* holding:

"*R.C. Can* concerned a very narrow set of circumstances in which the minority action was directed toward a specific, previously considered and articulated union objective. If union objectives are characterized in general terms—such as wages, job security, conditions of employment and the like—one can assume that in a great majority of instances minority action will be consistent with one or more of those objectives. *If R.C. Can is not applied with great care it would allow minority action in a broad range of situations and permit unrestrained undercutting of collective bargaining.*"

*Id.* at 790 (emphasis added). The court went on to state:

"We conclude that *R.C. Can* is of doubtful viability, and, in any event, its restricted factual framework does not reach the instant case. The challenge [to an employee's] discharge was not an established union objective. The union had been given no opportunity even to consider whether it should be an objective and, if an objective but not achieved, whether a strike would be employed as a

weapon. *To the contrary the minority group, acting outside the channels of union affairs, took action first to protest, then to enlist what support they could for a walk out, and after the event notified the bargaining representative of the walk out and sought approval."*

*Id.* at 791 (emphasis added).

One leading legal commentator has also concluded, based on this case law, that the legal theory relied upon by the majority is unsound and that "wildcat" strikes are unprotected activity *per se:*

"When ... employees have selected an exclusive representative to bargain with their employer, concerted activity on the part of a minority of employees, not formally authorized by the union, is commonly held unprotected."

Gorman, Basic Text on Labor Law 307 (1976). Furthermore, Professor Gorman interpreted the Supreme Court's *Emporium Capwell* decision as follows:

"The Court also rejected the argument of the court of appeals—and thereby apparently the premise of the *R.C. Can* decision as well—that the dissidents could not have been working at cross-purposes with the union ....

\*    \*    \*    \*    \*    \*

"The Court's emphasis upon the principle of exclusive representation, and upon the need to channel the views of all factions within the unit through the majority union, reinforces the prevailing view since the early 1940's that wildcat concerted activities are unprotected and render the participants susceptible to discharge."

*Id.* at 311.

In addition to being contrary to the overwhelming weight of case law "treat[ing] unauthorized strikes as unprotected activity *per se.*" *Food Fair Stores,* 491 F.2d at 394, the majority's holding that the Act protects a "spontaneous unorganized walk out and protest" defies common sense, particularly since this case arises in the health care field where sudden interruptions in service can have disastrous consequences. First, Judge Posner fails to even suggest why an unau-

thorized strike deserves the protection of the Act merely because it is spontaneous rather than planned in advance. On the contrary, the fact that a walkout is spontaneous should render it *less* deserving of protection since spontaneity is inimical and repugnant to the Act's goal of encouraging the *orderly* resolution of employment disputes. If the 17 employees in this case had first presented their views to their duly elected union and allowed the union to discuss the matter with the employer, the whole problem may have been resolved in an orderly fashion, with no interruption in patient care. However, rash spontaneous behavior such as the unauthorized "wildcat" strike in this case prevented the orderly resolution of the employment dispute.

The majority further attempts to justify its holding by stating that the 17 employees merely meant to "protest" the adoption of the new lunch period policy, rather than to compel their employer to deal directly with the 17 employees instead of the union. The fallacy of this argument is obvious since persons certainly do not protest merely for the sake of protesting (or for getting fresh air and exercise). Rather, the very purpose of any protest is to persuade someone to adopt a desired course of action—in this case, the 17 employees sought to coerce their employer into abandoning its new lunch period policy. Thus, it is not surprising that courts have repeatedly held that "wildcat protest" strikes are unprotected activity. *See e.g., NLRB v. Shop-Rite Foods, Inc.,* 430 F.2d 786, 791 (5th Cir.1970); *Food Fair Stores, Inc. v. NLRB,* 491 F.2d 388 (3d Cir.1974). The "wildcat" strike in this case was unprotected activity since "the minority group, acting outside the channels of union affairs, took action first to protest, then to enlist what support they could for a walk-out, and after the event notified the bargaining representative of the walk-out and sought approval." *NLRB v. Shop-Rite Foods, Inc.,* 430 F.2d 786, 791 (5th Cir.1970).

In conclusion, I would deny enforcement of the NLRB's order.