**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FEDERAL SECURITY, INC., Respondent.**

No. 97–2000.

United States Court of Appeals, Seventh Circuit.

Argued April 17, 1998.

Decided Sept. 9, 1998.

---

Elizabeth Kinney, National Labor Relations Board, Chicago, IL; John D. Burgoyne, William M. Bernstein (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for Petitioner.

Donald M. Leibsker, Chicago, IL; Charles W. Pautsch, Laura M. Smith, Ronald J. Passarelli, Wessels & Pautsch, St. Charles, IL, for Respondent.

Before CUMMINGS, BAUER, and MANION, Circuit Judges.

MANION, Circuit Judge.

The Robert Taylor Homes is one of the largest public housing complexes in Chicago and for that matter in the United States. Unfortunately, it is also one of the most dangerous due to drugs, gangs, and related violence. Because of the danger, the Chicago Housing Authority hired a private security company, Federal Security, Inc., which stationed two armed guards in each public housing building 24 hours a day. On August 11, 1992 a number of the security guards

walked off their jobs due to various workplace grievances. Federal responded by firing them. The guards then filed an unfair labor practice charge against Federal with the National Labor Relations Board, claiming that Federal discriminated against them for engaging in protected concerted activity under the National Labor Relations Act. The ALJ agreed and ordered Federal to reinstate the guards with back pay. Federal appealed that decision to the Board, but the Board adopted the ALJ's decision with some modifications. The Board now asks this court to enforce its order against Federal. Because the record evidence establishes that the guards' on-the-job walkout was not protected concerted activity under the NLRA, we deny the Board's application for enforcement.

## I.

Driving up State Street on the South Side of Chicago one encounters four miles of public housing, in particular the 28 buildings comprising the Robert Taylor Homes. It is one of the largest continuous stretches of public housing in the country, but not for much longer, as its 11,000 residents soon will be displaced when the Homes are razed. But for now the job of running the Robert Taylor Homes (and all other public housing complexes in Chicago) belongs to the Chicago Housing Authority (CHA). Because many of these complexes are infested with crime and violence, the CHA contracts with outside firms to provide two armed guards stationed around the clock in the lobbies of each building.

Federal Security is one of the firms hired by the CHA to guard the Robert Taylor Homes. The company's guards carry weapons and are stationed at the entrances of the building lobbies, checking the identification of persons who enter, assuring that guests entering with the consent of a resident are properly logged in. Historically, some buildings have been more scrutinized than others. For example, for several years Federal maintained a "sweep team," supervised by Chief

Carlton Short, whose team members (called Sergeants) guarded buildings previously subjected to room-by-room sweep searches at the hands of the Chicago police and other officers, including Federal guards. The officers swept a building to uncover weapons, drugs, and unauthorized persons, among other things, and then set up round-the-clock guard posts in the building lobby. The guards in the lobby worked in three shifts (two to a post), covering the swept buildings 24 hours a day, ensuring that only residents and guests entered. No guard on the sweep team could leave a post unless relieved by a replacement.

On August 11, 1992, at about 8:30 a.m., one of the sweep team guards (Sergeant Robinson) called Federal's office to announce that the guards would be leaving their posts at 10:00 a.m. unless Federal's owner, James Skrzypek, met with them to discuss their grievances.[1] Robinson did not speak with Skrzypek but left the message with a member of his staff, who in turn was unsuccessful in her attempts to reach Skrzypek. At about 10:00, right on schedule, at least 17 and possibly as many as 27 of these sweep guards radioed "1099", signaling they were abandoning their posts, thereby leaving an officer alone or a post completely unattended. In fact, four posts were left unguarded. The guards then marched through the middle of the housing complex, trying to enlist the support of other guards in CHA buildings. They talked to guards on duty and asked them to join them in the walkout; many did. The strikers ended up in a nearby park where they decided to prepare a list of demands to present to Federal. The parties agree that Federal was able to assign substitute guards to the unattended buildings within about 20 minutes of the walkout.

Shortly after the walkout began, Skrzypek informed the front office that the officers who left their posts were to be terminated immediately because they were automatically placed on a "bar list"—barring them from

---

1. The exact grievances are not clear from the administrative record, but apparently the guards believed that Chief Short had been terminated. Actually, he had been "suspended pending termination" for repeated scheduling problems at one

of the housing complexes. The employees apparently also believed that Sergeant Larry Smith had been terminated for leaving his post to aid his injured son. He, too, had been "suspended pending termination."

CHA property pursuant to Federal's agreement with the CHA. Federal forwarded the names of the guards who participated in the walkout to the CHA. Some of the employees, who submitted requests to Federal to be reinstated, were removed from the bar list and have returned to guard duty. It is not clear how many protesting guards returned to work, but most did not.

On August 20, 1992, Joseph Palm filed an unfair labor practice charge with the NLRB on behalf of himself and 16 other discharged security guards. The charge alleged violations of § 8(a)(1) (interference with concerted activity under section 7 of the NLRA) and § 8(a)(3) (discriminating against individuals for engaging in concerted activity). The NLRB filed its complaint and notice of hearing, which was held before an ALJ. The ALJ found that the walkout constituted concerted activity under the NLRA, and ordered Federal to reinstate the discharged guards with back pay. The Board affirmed that decision, but went a step further, ordering Federal to reinstate the sweep team classification, which Federal had eliminated after the walkout. The Board's decision does not include a dissent, but Member Truesdale appears to have disagreed with the Board on the important issue—whether the walkout constituted protected concerted activity. In footnote 2 of the Board's decision, Truesdale notes that he would not have found the walkout protected "because it compromised the safety of the residents of the CHA properties and of the nonstrikers who were left alone at some locations." Now the Board petitions this court, seeking enforcement of its order.

## II.

■ We have to get over a jurisdictional hurdle before proceeding to the merits of the appeal. Federal argues that the Board lacked jurisdiction over the guards' unfair labor practice charge because the NLRA exempts from its coverage states and political subdivisions. *See* 29 U.S.C. § 152(2). Federal did not raise the issue of the Board's jurisdiction until it filed (with the Board in Washington) official objections to the ALJ's decision. The Board insists the jurisdictional objection was too late to preserve the issue,

and we agree that it appears to be an argument available to Federal from the outset. But even the Board concedes that challenges to its statutory (as opposed to discretionary) jurisdiction may be raised at any time. Federal's contention that Congress explicitly excluded it from the Act's coverage surely is the type of jurisdictional challenge the Board agrees can never be waived. We therefore must consider the challenge to determine whether we need go any further, for if the Board had no jurisdiction over Federal's decision to fire the guards, then its finding of an unfair labor practice and its decision to reinstate those guards must be summarily reversed.

■ At bottom Federal argues that while it is not directly an arm of government (and thus a "political subdivision" explicitly excluded from the Board's jurisdiction under the statute), it nevertheless is covered by the statute's exclusion because the Chicago Housing Authority (which is an arm of city government) exercises substantial control over its operations. At the time Federal discharged the guards in this case the Board's practice was not to exercise jurisdiction over a private employer (contracting with the government to provide services) if the government exercised considerable control over the contractor's labor relations (including wage setting and the like). The Board followed that rule, announced in *Res-Care, Inc.*, 280 NLRB 670, 672, 1986 WL 53982 (1986), until 1995, when it abruptly abandoned it in favor of a simpler test that cast a wider net—the Board would exercise jurisdiction over any entity that meets the definition of "employer" under the Act, including the applicable jurisdictional monetary standards. *See Management Training Corp.*, 317 NLRB 1355, 1358, 1995 WL 451936 (1995). The change in policy has caused confusion because it was announced overnight with cases (like this one) involving jurisdictional disputes still pending. For a reason not apparent to us, over the years the Board consistently has issued new rules through its adjudicative rather than rule-making authority. It is lawful to do so, *see SEC v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), but the

availability of its rule-making powers means that "it has less reason [than a court] to rely upon ad hoc adjudication to formulate new standards of conduct." *Id.* Instead, the "function of filling in the interstices of regulatory statutes should be performed, as much as possible, through [the] quasi-legislative promulgation of rules to be applied in the future." *Id.*

In this case we need not linger over our serious questions about the manner in which the Board issues sweeping rules changes because no matter which test the Board applied here, we would agree that it has jurisdiction over Federal. Certainly Federal satisfies the statutory definition of "employer" under the Act, thus satisfying the standard under *Management Training*, and we cannot say that the CHA's measure of control over Federal is so great as to divest the Board of jurisdiction under its now-defunct *Res–Care* standard. One example will do: while the CHA insisted that Federal guards be paid a wage minimum, it did no more, and Federal was allowed to set the exact wage (and level of benefits) without interference or oversight from the CHA. Therefore, the Board had jurisdiction over Federal and lawfully was entitled to adjudicate the guards' unfair labor practice charge against the company, meaning we can proceed to the substantive arguments Federal raises against the Board's decision.

█ The ALJ found that Federal violated Section 8(a)(1) of the Act, which makes it an "unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights [to self-organization, collective bargaining, and concerted activity for the purpose of collective bargaining or other mutual aid or protection]." 29 U.S.C. § 158(a)(1). The Board adopted the ALJ's decision, which we review (as in all other administrative cases) to determine if it is supported by substantial evidence.

█ The general rule under the NLRA is that employees have the right to strike for the purpose of mutual aid and protection, but the right is not absolute. A bargaining agreement itself may rule out a strike, in which case a union that calls a strike would be breaching the agreement and violating

labor law. Another exception arises when the strike is abnormally destructive and threatens the health or safety of others. *See, e.g., Aroostook County Regional Ophthalmology Center v. NLRB*, 81 F.3d 209, 214 (D.C.Cir.1996) (denying enforcement of Board order and holding that employees' "grousing" about work schedules in the presence of patients was "plainly inconsistent with the reasonable demands of caretaking" and therefore not protected activity because of its "great potential to unsettle patients"). At one extreme, it means that a nurse can't walk out of an operation to engage in a strike, nor can an air traffic controller walk off the job. A worker who has timed his walkout so as to create a hazardous condition in a plant (e.g., the worker who walks off leaving boilers unattended, *NLRB v. Reynolds & Manley Lumber Co.*, 212 F.2d 155, 158 (5th Cir.1954)) is not protected, either. Less extreme though disruptive behavior may also lose protection under the Act; section 10(c) allows employers to discharge employees for cause, and "there have been scores of cases over the years in which employers have lawfully disciplined employees for misconduct short of that which is flagrant, violent, or extreme." *Aroostook County*, 81 F.3d at 209, 215 n. 5. For our purposes it is enough to say that otherwise protected activity surely loses its protection when it compromises the safety of others; the Act permits employees to exercise self-help, but not in a reckless way. (Of course more must be shown than the strike activity caused the employer inconvenience, for leverage is the whole purpose of the strike in the first place.) Federal invokes this "health and safety" exception and argues it was entitled to discharge the striking guards precisely because they endangered the lives of others.

Both sides agree that the important case in this area is *East Chicago Rehabilitation Center v. NLRB*, 710 F.2d 397 (7th Cir.1983), in which we found that nurses' aides who walked off the job for two hours were engaging in protected activity despite the obvious importance of their job:

The Board found that "although some patient care schedules were not completely adhered to, there is no showing that the

strike jeopardized any patient's safety or health," noting that "once the strikers offered to return to work they could not be held responsible for any subsequent interruption in normal patient servicing." Our job is to decide whether these findings are supported by substantial evidence on the record as a whole. The strongest evidence is that when management learned that the workers were willing to resume work immediately it refused to take them back. Unless the Center wanted to be prosecuted for criminal neglect it would not have done this if there were danger to its patients.

710 F.2d at 405. While we found the walkout was protected, we noted the ALJ's decision easily could have gone the other way. The bottom line was that "nurses' aides are not professionals and are not entrusted with critical responsibilities." *Id.*

The question facing us in this case is whether the guards fairly can be compared to the nurses' aides in *East Chicago Rehabilitation Center*, or other positions left to the imagination that may be important but not in the sense that the people in them are "entrusted with critical responsibilities." The distinction between the facts in this case and those in *East Chicago* is clear: while the nurses' aides left behind doctors, nurses, and other front-line health care workers to provide cover, here the guards were the front line, leaving behind unattended stations and vulnerable residents. As we noted above, the Robert Taylor Homes have two armed guards per building for a reason; when they're gone, residents are at much higher risk.

The next question is how critical was the protection the protesting guards refused to give? The answer is in record evidence undisputed by the parties but largely unmentioned by the ALJ. The guards carry guns

and were slated to wear bulletproof vests. They patrol the buildings around the clock. They monitor all guests who enter and all who exit. These were buildings designated as high-crime areas to begin with, which is why they had been "swept" by the Chicago Police Department and then sealed with only one passage in and out. The guards are more than a presence; they are a deterrent. Their presence at every building (stationed at each passage at all hours) demonstrates that the CHA views them as vital and critical. And when they walked out of the Robert Taylor Homes, they did so conspicuously, literally parading across the complex, recruiting others to join the march, in full view of the residents (and perhaps more importantly, in view of those from whom the residents are to be protected). They took their guns and radios with them (the radios are supposed to be left behind for the next guard on a post so he can communicate with the front office); the guards left at least four buildings unattended. In addition, they gave almost no warning to Federal (calling 90 minutes ahead and leaving word with a "dispatcher" is at best a token gesture), and no consensus as to a reason—at least until after the walkout, when for the first time they thought it best to draft a list of tangible demands. Prior to the strike, they demanded a meeting with Federal's president but never went to his office. And more than this, as we noted above, in several instances they left no one behind to guard the buildings. Were they endangering the lives of the residents and the unaccompanied guards they left behind by walking out in that manner? We must agree with Member Truesdale that the only reasonable answer is yes.[2]

The ALJ extended the Act's protection to the striking guards principally because he found no harm resulted from the walkout. Our review of the record casts doubt on that conclusion,[3] but we need not decide the issue

---

2. In reaching this conclusion, we are not claiming that circumstances could never allow guards like those in this case to strike, a right generally provided by the NLRA. Indeed, the Board found that Federal's no-strike rule violated Section 8(a)(1) of the Act. Federal did not object to that part of the Board's decision until its reply brief, which is too late to permit our review. We therefore need not decide whether Federal is

correct in claiming that the guards should not be able to strike under any circumstances because Illinois law prevents security officers of public employers from doing so. *See* 5 ILCS 315/14(m).

3. In fact, the record evidence contradicts it. At least 200 residents in one building nervously congregated in the lobby and watched as the strikers attempted to convince the guard on duty

because we reject the ALJ's focus. Whether actual harm resulted is hindsighted and irrelevant. The proper focus is that the unguarded stations unquestionably heightened the danger to residents. If harm ultimately was avoided, it is to the credit of Federal's quick response to the crisis; we see no reason why the conduct of the guards should be exempted because of such diligence. The "health and safety" exception does not ask whether anyone actually was harmed by the activity otherwise protected; it asks whether the activity endangered anyone to the point that harm was foreseeable. For the unguarded residents (and guards left without partners) that day, 20 minutes was long enough to place them in serious danger, which should have been the focus of the ALJ, and on appeal, the Board. At oral argument we asked the Board's Washington-based attorney whether he had ever visited the Robert Taylor Homes or anywhere else in the area on the South Side; he assured us he had not. The record brought the area to life well enough for us to decide that the guards in this case exposed residents to heightened danger when they abruptly abandoned their posts, a conclusion that makes their conduct unprotected under the NLRA and their discharges lawful. Enforcement denied.

**The National Advisory Group for Justice, Amicus on Behalf of the Appellant.**

No. 97–4142.

United States Court of Appeals,
Eighth Circuit.

Submitted May 15, 1998.

Decided Aug. 17, 1998.

to abandon the residents and join them in the walkout. The ALJ acknowledged that it took Federal nearly an hour to restore order at that building. If not physically harmed, the residents obviously were frightened.