**11-3147-ag**
*NLRB v. Special Touch Home Care Servs., Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————

August Term, 2012

(Argued: January 30, 2013      Decided: February 27, 2013)

Docket No. 11-3147-ag

———————————————

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

-v.-

SPECIAL TOUCH HOME CARE SERVICES, INC.,

*Respondent*,

1199SEIU UNITED HEALTHCARE WORKERS EAST,

*Intervenor.*

———————————————

Before:

WESLEY, CHIN, *Circuit Judges,* LARIMER*, District Judge.*[*]

Petitioner National Labor Relations Board applies to this Court for enforcement of its January 30, 2011 Decision and Order finding that Respondent Special Touch Home Care Services, Inc. ("Special Touch") violated the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3), by failing to immediately reinstate striking workers

————————————————

[*] The Honorable David G. Larimer, of the United States District Court for the Western District of New York, sitting by designation.

1

engaged in protected conduct. Home health care aides who work for Special Touch went on strike after their Union gave ten days of advance notice as required by statute, 29 U.S.C. § 158(g). Special Touch lawfully polled its approximately 1400 employees scheduled to work on the first day of the strike. Forty-eight of the aides who indicated their intention to work failed to report to their patients' homes. Because we find that these employees engaged in unprotected, indefensible conduct that created a reasonably foreseeable risk of imminent danger, we DENY the National Labor Relations Board's petition for enforcement.

DENIED.

_____

JILL A. GRIFFIN, Supervisory Attorney (Lafe E. Solomon, Acting General Counsel, Celeste J. Mattina, Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Amy H. Ginn, Attorney, *on the brief*), National Labor Relations Board, Washington, DC, *for Petitioner*.

RICHARD J. REIBSTEIN (Russell E. Adler, *on the brief*), Pepper Hamilton LLP, New York, NY, *for Respondent*.

DAVID M. SLUTSKY, Levy Ratner, P.C., New York NY, *for Intervenor*.

_____

WESLEY, Circuit Judge:

This petition for enforcement presents two issues: (1) whether a health care employer may enforce an individual notice rule after its employees' union provides advance

notice of an impending strike pursuant to 29 U.S.C. § 158(g); and (2) whether health care employees who fail to report to work at individual patients' homes without alerting their employer create a reasonably foreseeable risk of imminent danger.

**Background**

Respondent Special Touch Home Care Services, Inc. ("Special Touch") subcontracts with nursing and health-related services to provide home health aides for patients who require assistance. Special Touch's patients have four common characteristics: (1) a physician ordered home health care services; (2) they have an illness that prevents them from normal functioning and daily living activities; (3) they are "homebound;" and (4) they are receiving skilled nursing, physical, occupational or speech therapy. Given the nature of its services, Special Touch has a call-in rule requiring aides who will not be able to report to their patients' homes as scheduled (for any reason) to notify Special Touch. Because aides go directly to patients' homes, Special Touch uses an automated attendance system. The company gets a report of which aides have not called in after the start of their shifts, at which point Special

3

Touch calls each home to verify whether or not the aide is there. Confirming an aide's presence takes approximately twenty minutes.

In 2004, Special Touch had approximately 2500 aides on its roster, with about 1400 of these aides regularly assigned to specific clients. Aides are typically matched with patients based on common language, primarily English, Spanish, Chinese or Russian. Patients receive varying amounts of care; some have an aide present twenty-four hours per day, seven days a week, while others require just a few hours each week. The necessary amount of care is determined by the patient's physician. A nursing agency sets the specific "plan of care" and then subcontracts the work to Special Touch.

Aides who work for Special Touch undergo two-and-a-half weeks of mandatory training before being assigned to patients. The specific responsibilities of an aide depend on the individual patient's plan of care, but they will often include helping the patient bathe and maintain good personal hygiene, helping patients move around and transfer from a chair to bed or to the bath, meal planning and preparation, light housekeeping, and grocery shopping and

errands.  Aides often remind patients to take medication and ensure they are taking the proper doses, but aides do not, and cannot, perform medical procedures.  Special Touch's handbook explicitly lists functions its aides are *not* to perform, including: taking vital signs, changing bandages, giving medication, and "[g]iv[ing] any care not included on the nursing care plan."

According to Inessa Lutinger, a registered nurse instructor who trains aides for Special Touch, "our role is prevention, prevention of higher level care, prevention [of] patient hospitalization, and prevention [of a] patient [becoming] a resident in the nursing home."  To achieve this end, aides are taught, among other things, how to look for signs of distress, to prevent falls and to recognize signs of internal bleeding.  In addition, aides are trained how to respond to an emergency, whether health-related or external (such as a fire).  According to Lutinger, one of the biggest worries with patients is their susceptibility to falling – particularly falling backwards – because of their lack of balance and strength.  Lutinger explained that the high risk of falls is the reason the aides are tasked with light housekeeping: "[I]f you keep your floor neat and nice, it

decrease[s the] probability of falling, and as a consequence[] of possible fatal injuries."

**Facts**

On May 27, 2004, New York's Health and Human Service Union 1199SEIU, AFL-CIO, CLC (the "Union") notified Special Touch of its intent to strike from Monday, June 7, 2004 at 6:00 a.m. until Wednesday, June 10, 2004 at 6:00 a.m. During the week prior to the strike, coordinators and supervisors from Special Touch contacted the approximately 1400 aides scheduled to work to inquire whether they planned to take any time off during the upcoming week.[2] The majority of the aides indicated their intent to work as scheduled. Approximately seventy-five aides said that they anticipated being absent during part of the following week (whether for purposes of striking or for other reasons).

---

[2] In *Preterm, Inc.*, the Board determined that a health care organization may survey its employees to determine whether they plan to work during an upcoming strike after receiving a ten-day notice from the union. 240 N.L.R.B. 654, 656 (1979). The Board proceeded to specify three requirements for a pre-strike survey: (1) explain the purpose of the questioning, (2) assure employees that "no reprisals would be taken against them as a result of their response," and (3) refrain from otherwise creating a coercive atmosphere. *Id.* At oral argument, the Board agreed that the poll here was never alleged to be unlawful and is therefore not challenged in this action.

Special Touch arranged for replacements to cover these employees' patients.

Forty-eight[3] aides who had not previously conveyed their plans to be absent during the strike did not appear for work on Monday morning, June 7, 2004. Most of these aides spoke Spanish, which made finding emergency replacements for them difficult. Unbeknownst to Special Touch, the Union had held a meeting shortly before the strike, at which it advised aides that they did not need to notify the company if they planned to strike because the Union had already provided the requisite ten-day notice required by 29 U.S.C. § 158(g) for health-care workers.[4]

On June 7, when forty-eight aides who were expected to work failed to call in or report, Special Touch struggled to get replacements to its patients. These patients included people suffering from recent strokes, Parkinson's disease,

---

[3] Although forty-eight aides struck after saying they would report to work, the disciplinary measures Special Touch took are relevant for only forty-seven of these aides because Crecencia Miller was lawfully discharged for other reasons. *See Special Touch Home Care Servs., Inc.*, 351 N.L.R.B. 754, 754-55, 757 (2007) (*Special Touch II*).

[4] The Union explains in its brief that: "1199 correctly informed the Aides that the Union's notice was the only notice lawfully required, and individual Aides had no obligation to provide individual notice to Special Touch."

early-onset Alzheimer's disease and other memory problems, epilepsy, broken limbs, diabetes, osteoporosis, breast cancer, developmental disabilities, and impaired mobility; some of these individuals were over eighty years old. Forty-three of the patients received partial coverage, while five patients did not receive any coverage. According to Special Touch Vice President of Operations Linda Keehn, "[s]ome of them got partial service because we didn't find out right away . . . . [It] was very, very confusing, very chaotic. Here all of a sudden, we thought we had everything sort of covered . . . ."

Following the strike, the seventy-five aides who had advised Special Touch of their planned absence when asked during the pre-strike poll were immediately reinstated to work with their previously-assigned patients. The forty-eight aides who responded during the poll that they intended to work but failed to report as expected were advised not to return to their assigned patients until further notice. These forty-eight aides were ultimately reassigned over the next few months, but not always to their prior patients or to similar work schedules. One week after the strike began, Keehn sent letters to these forty-eight aides detailing the

8

company's position on their absence:

> You were asked if you would be taking any time off the week of June 7th. You told us that you would be working.
>
> Despite your assurance, you did not show up at the patient's home on June 7th, nor did you call into the office at any time prior to the start of your shift to advise us that you would not be working that day. As a result, you left the patient at risk of being unattended by a home health aide.
>
> You know that Special Touch policies and procedures require you to call in.

(JA 863.)

The letter goes on to state that Special Touch was aware of the confusion over notification following the Union meeting, and, as a result, the company had determined not to terminate any of the employees.

## Procedural History

After the Union filed charges against Special Touch, the National Labor Relations Board's ("Board") General Counsel issued a complaint charging Special Touch with violating the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1) and (3),[5] by failing and refusing to

---

[5] Section 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3), provides that:

9

reinstate the forty-eight aides who participated in the strike unexpectedly. Administrative Law Judge Raymond P. Green ("ALJ") held a hearing, at which he heard testimony by eleven of the striking aides, various Special Touch supervisors and coordinators, Keehn, and Lutinger. The ALJ ruled that Special Touch could not defend its treatment of the forty-eight aides as unprotected strikers because their failure to comply with the company's call-in rule did not alter their status as protected workers. *Special Touch Home Care Servs., Inc.*, 2005 N.L.R.B. LEXIS 472, at \*20-22 (Sept. 15, 2005) (*Special Touch I*). The ALJ reasoned that to find otherwise would mean that "an employer could, by enactment of a private rule, nullify the public rights guaranteed by a statute of the United States" – namely, 29 U.S.C. § 158(g). *Id.* at \*14.

The ALJ discussed Congress's enactment of Section 8(g)

(a) Unfair labor practices by employer

It shall be an unfair labor practice for an employer–

> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

10

in 1974, which requires unions to give ten days of notice to health care facilities before their employees go on strike.[6] He confirmed that the notification requirement is limited to unions and does not apply to individual employees. *See id.* at *17. The ALJ rejected Special Touch's argument that some type of notice requirement was appropriate in this situation because of the "imminent danger" to patients that would be created otherwise: "[a]ssuming arguendo that an 'imminent danger' qualification can be read into the Act's conference of the right to strike, the evidence does not establish that such a danger existed in this case." *Id.* at *19. The ALJ reasoned that "there were only about five clients for whom the Respondent could not get coverage. And as to them, there was no evidence that they suffered any adverse consequences." *Id.* at *20. Accordingly, the ALJ concluded that Special Touch had violated 29 U.S.C. § 158(a)(1) and (3) by failing to immediately reinstate the forty-eight

---

[6] Section 8(g) of the NLRA, 29 U.S.C. § 158(g), provides that:

A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention . . . . The notice shall state the date and time that such action will commence . . . .

11

strikers upon their unconditional offer to return to work. *See id.* at *35.

The Board adopted the ALJ's reasoning with respect to Special Touch's violation of Section 8(a) and petitioned this Court for enforcement of its September 29, 2007 Decision and Order. *Special Touch Home Care Servs., Inc.*, 351 N.L.R.B. 754 (2007) (*Special Touch II*). We issued a decision enforcing the order in part, modifying and enforcing as modified in part, and remanding for the Board to consider the intersection of the "plant rule" doctrine and Section 8(g). *NLRB v. Special Touch Home Care Servs., Inc.*, 566 F.3d 292 (2d Cir. 2009) (*Special Touch III*). We were concerned with the potential incompatibility between the plant rule doctrine, which allows employers to enforce neutral plant rules governing employees on company time (such as Special Touch's call-in rule), and Section 8(g)'s union notification requirement. *See id.* at 297-301. We remanded and advised the Board to balance three key interests in resolving the issue: "(1) the employer's attempt to maintain a properly regulated workforce, (2) the employees' interest in striking (including their interest in not having to decide in advance that they wished to

12

participate), and (3) the risk to the clients, including the nature of the care provided by the aides." *Id.* at 300. We did not reach Special Touch's remaining arguments regarding indefensible conduct (imminent danger), permanent replacement and the legitimate business justification defense. *See id.* at 301.

On remand, the Board re-affirmed its prior conclusion that Special Touch had violated Section 8(a)(1) and (3) by refusing to promptly reinstate the forty-eight striking aides. *Special Touch Home Care Servs., Inc.*, 2011 N.L.R.B. LEXIS 322 (June 30, 2011) (*Special Touch IV*). The Board concluded that Congress had already balanced the relevant interests at stake with respect to health care strikes and reached a conclusion: Section 8(g).[7] *See id.* at \*13-19. The Board determined that the union notification rule represented a compromise reached by legislators endeavoring to balance two competing interests: first, the previously limited rights of health care employees, and second, the special protection necessary for patient care. *See id.* at \*15-16.

---

[7] The Board further noted that "[i]f the balance established by Congress in the 1974 amendments is imperfect, it is up to Congress, not the Board, to adjust it." *Special Touch* IV, 2011 N.L.R.B. LEXIS 322, at \*19.

With respect to patient care, the Board acknowledged that even health care employees who "cease work without taking 'reasonable precautions to protect' the employer's plant, equipment, or patients 'from foreseeable imminent danger due to sudden cessation of work'" are not protected under the NLRA. *Id.* at *41 (quoting *Bethany Med. Ctr.*, 328 N.L.R.B. 1094, 1094-95 (1999)). The Board rejected the claim that Special Touch's aides' failure to warn the company about their intent to strike created an "imminent danger." *See id.* at *19-22. However, the Board noted that "under appropriate circumstances, we would entertain an argument that despite prior notice, a strike, or particular employees' participation in a strike, created an imminent danger." *Id.* at *22 n.17.

Finally, the Board reviewed and rejected Special Touch's argument that its aides' misrepresentations during its pre-strike polling justified denying immediate reinstatement. Disavowing Special Touch's contention that the right to poll employees loses all value if the employees need not answer accurately, the Board declined to adopt a rule requiring honesty in polling or allowing discipline in its absence. *See id.* at *33.

14

Member Hayes dissented, arguing that under "the particular facts of this case," Special Touch acted lawfully because the company had shown a "sufficiently compelling business justification for enforcing its call-in rule and that justification outweighs the minimal burden imposed on employees' protected right to strike."  *Id.* at *47 (dissent).  The dissent focused on the forty-eight aides' affirmative misrepresentations upon being polled.  Member Hayes reasoned that the majority's ruling meant that employees need never provide a lawful answer to a post-notice of strike survey, "thus eviscerating the poll as an effective aid in arranging for continuing patient care."  *Id.* at *51.  The dissent noted further that this would allow unions and employees the opportunity to wield their ability to strike in a dangerously disruptive manner – essentially, by purposely misleading their employer.  *See id.* at *51-52.

The Board's June 30, 2011 Decision and Order holding Special Touch responsible for violating Section 8(a)(1) and (3) is now before us on the Board's petition for enforcement.

15

**Discussion**

Special Touch makes two main arguments before this Court. First, Special Touch contends that the Board ignored our mandate instructing it to balance the interests of employees, employers and clients in determining whether failure to comply with the company's call-in rule renders otherwise lawful strikers' actions unprotected. The NLRB argues that the Board did consider the interests of the aides, Special Touch and patients "by giving heed to the balance Congress already struck with regard to their interests." (Petitioner's Br. at 28.)

Second, Special Touch argues that the Board erred in rejecting its "imminent danger" defense, pursuant to which the company claims that forty-eight aides failed to take reasonable precautions to protect their patients from foreseeable imminent danger. The NLRB gives little attention to this argument, stating that the record fails to show that patients were subject to substantial risk of harm and, instead, only that the company was inconvenienced.

We will enforce the Board's order if its legal conclusions have a "reasonable basis in law." *See NLRB v.*

*Windsor Castle Health Care Facilities, Inc.*, 13 F.3d 619, 623 (2d Cir. 1994)(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).  We review the Board's factual findings for whether they are supported by substantial evidence.  *See id.*  Here, the facts are not in dispute.  Accordingly, we review the Board's application of law to fact *de novo*, deferring to the Board's decision if there is "more than one reasonable resolution," one of which the Board has adopted.  *See Sheridan Manor Nursing Home, Inc. v. NLRB*, 225 F.3d 248, 252 (2d Cir. 2000).

**I. "Plant Rule" Doctrine**

We previously remanded to the Board for the specific purpose of considering the intersection between the plant rule doctrine and Section 8(g).  We understand the plant rule doctrine to "permit[] an employer to enforce neutral 'reasonable rules covering the conduct of employees on company time.'"  *See Special Touch III*, 566 F.3d at 297 (quoting *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 n.10 (1945)).

In *Republic Aviation*, the Supreme Court upheld the Board's finding that a company's rule prohibiting any type of solicitation on company property could not be used to

17

prohibit union solicitation on the premises during an employee's free time without violating Section 8(3). *See* 324 U.S. at 795, 805. The Court reached this result by endorsing the Board's established presumption that the NLRA does not prevent employers from establishing "reasonable rules" governing employee conduct while "on company time." *Id.* at 803 n.10 (quoting *Peyton Packing Co.*, 49 N.L.R.B. 828, 843 (1943)). The Court (like the Board) emphasized the importance of rules regulating the workplace applying to conduct occurring "during working hours." *See id.*

The Board subsequently relied on the plant rule doctrine to uphold the termination of employees who violated a neutral notification rule at a chicken-processing plant. *See Terry Poultry Co.*, 109 N.L.R.B. 1097 (1954). In *Terry Poultry*, the company had a "long-standing plant rule" requiring factory workers to notify other personnel if they were leaving the assembly line. *See id.* at 1097-98. Two employees violated this rule by leaving the line to make a labor complaint to the plant's superintendent. *See id.* Their undisclosed departure caused disruption of the production line. *See id.* at 1098. The employees were terminated for violating the plant rule. *Id.* at 1099. The Board upheld their terminations after finding that the rule was not adopted for

18

a discriminatory purpose but was instead aimed solely at ensuring efficient business practices. *See id.* at 1098-99. The Board further supported this decision by reasoning that the rule did not constitute an "unreasonable impediment" to the employees' exercise of their rights under the NLRA. *See id.* at 1098.

The Board later cited to *Terry Poultry* in upholding employee suspensions for violating a chemical plant's "longstanding, well-publicized rule requiring operators to be properly relieved before leaving the plant" during a strike. *See Gen. Chem. Corp.*, 290 N.L.R.B. 76, 83 (1988). This case brought in elements of both the plant rule doctrine and the imminent danger doctrine, discussed *infra*, because the rule at issue in *General Chemical* was not intended merely for factory efficiency, but primarily for "ensur[ing] safety to the equipment, the plant, and the general public." *Id.* The Board found that the employees' failure to take the reasonable precaution of spending fifteen minutes obtaining relief at their stations created a "reasonably foreseeable possibility of danger." *Id.* However, because the "danger was eminent (significant) rather than imminent (impending)," the Board relied primarily on the plant rule doctrine to find

19

that the employer's response did not violate the NLRA. *See id.* at 83–84.

In its analysis of these key plant rule decisions, the Board noted some crucial differences between the facts therein and those at issue here, *see Special Touch IV*, 2011 N.L.R.B. LEXIS 322, at \*26-30, as did we, *see Special Touch III*, 566 F.3d at 298-99. First, the companies in the plant rule cases did not receive any prior notice of concerted activity. Special Touch had ten days' notice provided by the Union. Second, the plant rule cases emphasize the propriety of reasonable rules regulating employee conduct "on company time." Here, the relevant rule focuses specifically on employee conduct outside of working hours by requiring advance notice of an employee's intent to miss work.

The Board contends that a better match for this case is *Savage Gateway Supermarket*, 286 N.L.R.B. 180 (1987), *enfd.*, 865 F.2d 1269 (6th Cir. 1989) (unpublished decision), in which the Board examined when an employer's desire to enforce a plant rule is supported by compelling business interests sufficient to outweigh certain rights held by employees. In *Savage Gateway*, the Board determined that a grocery store had violated the NLRA by terminating an employee who did not show up for work on two consecutive days while picketing was

ongoing in front of the store. *See id.* at 183-84. The company argued that its termination of the employee was due to her failure to comply with its "longstanding work rule requiring notification of absence to the store manager." *Id.* at 183. The Board rejected this contention, finding that the employer did not have a compelling business interest for enforcing its rule that was sufficient to outweigh the employee's right to engage in protected activity. *See id.* Instead, the company sought to apply its rule for the sake of convenience. *See id.*

Special Touch argues that the Board's reliance on *Savage Gateway* is misplaced in light of this Court's decision in *Business Services by Manpower, Inc. v. NLRB*, which is cited in *Savage Gateway* and features facts more closely analogous to those at issue here. 784 F.2d 442 (2d Cir. 1986). In *Manpower*, the company supplied temporary employees to businesses with industrial or clerical short-term assignments. *See id.* at 443. Because the employees reported directly to the temporary employer that had contracted with Manpower, the company had a policy that any employee who could not make it to an assignment had to call in and that anyone who failed to call in or report to work would be considered to have resigned. *See id.* Two employees sent to

21

fill a shift at a factory chose not to work after seeing a "stranger" picket line composed of five or six workers from one of the temporary-employer's plants located 100 miles away. *See id.* at 443-44.

Manpower considered these employees to have resigned after they did not show up for their assignment. *See id.* at 444. The Board ruled that the company violated the employees' rights under the NLRA. *See id.* at 445. We declined to enforce this order because we determined that Manpower had "compelling business reasons" for enforcing its policy that were sufficient to overcome the employees' exceptionally "thin" protected rights under the circumstances. *See id.* at 454.

Here, Member Hayes takes a similar position in dissent: Special Touch's business reasons for enforcing its call-in rule were sufficiently compelling to override the minimal burden that compliance with the rule imposed on the aides' right to strike. The dissent notes that Congress intended for health care workers to be treated the same as any other industry employees, such that legitimate business reasons that would justify a non-health care company's conduct should suffice equally in the health care field. *See Special Touch IV*, 2011 N.L.R.B. LEXIS 322, at *52 (dissent). This argument

22

is tempting.  After all, Special Touch has compelling business interests for enforcing its call-in rule (providing aides when and where the company said it would) that are very similar to the interests cited by the company in *Manpower*.

The problem with this position, however, is that it elevates the company's preferences over those espoused by Congress.  Congress's decision to require *union* notification via Section 8(g) trumps Special Touch's interests in enforcing its call-in rule, regardless of whether its argued basis for doing so is business-related or safety-oriented.[8] As the Board correctly determined, to hold otherwise would constitute a rejection of the balance struck by Congress in enacting Section 8(g).

Section 8(g), one of Congress's amendments to the NLRA in 1974, is part of a package intended to remedy the exclusion of nonprofit hospital workers[9] from the protections

---

[8] Member Hayes' dissent assures us that "the call-in rule here comes into play only *after* the Respondent conducted the lawful survey . . . and only for those aides who answered that they would work on June 7, then failed to do so without giving notice."  *Special Touch IV*, 2011 N.L.R.B. LEXIS 322, at *48 (dissent) (emphasis in original).  But the dissent's argument is, nonetheless, that Special Touch's call-in rule should be enforced.

[9] At the time, 56 percent of all hospital employees worked at nonprofit, non-public hospitals. *See Staff of S. Comm. on Labor, 93d Congress, Legislative History of the Coverage of Nonprofit Hospitals under the National Labor Relations Act,*

guaranteed by the NLRA while still ensuring "that the needs of patients would be met during contingencies arising out of labor disputes." *See Staff of S. Comm. on Labor, 93d Congress, Legislative History of the Coverage of Nonprofit Hospitals under the National Labor Relations Act,* (Comm. Print 1974) (hereinafter *Legislative History*). The 1974 amendments were the result of "extensive discussion with those groups representing employers, employees and the administration" in the health care industry. *Id.* The goal of the amendments was to incorporate "the public interest demand[] that employees of health care institutions be accorded the same type of treatment under the law as other employees in our society." *Legislative History*, S. Rep. No. 93-766, at 11 (1974). With this in mind, the union notification provision is intended as a sufficient safeguard to enable health care workers to strike; there is no requirement that individual employees provide notice. The Board, and this Court, have recognized this principle repeatedly.

For example, in *Montefiore Hospital and Medical Center v. NLRB*, we confirmed that Section 8(g) contains a "clear

_____

(Comm. Print 1974).

24

limitation" requiring notice from labor organizations and not from individual workers – an interpretation that had been confirmed by numerous other Circuits as well as the Board. 621 F.2d 510, 514-15 (2d Cir. 1980). Our comments in dicta that after a "union has given notice of its intention to strike, the hospital would be well-advised to inquire of the rest of its employees whether they plan to stay out in sympathy" and that "[a]n employee who strikes after promising to show up may well forfeit protection under the Act" have no bearing on Section 8(g)'s requirements. *Id.* at 515. We supported this assertion by citing to *Silbaugh v. NLRB*, 429 F.2d 761, 762 (D.C. Cir. 1970), which proposes that an employee who strikes "in violation of a union's commitment to an employer not to do so" is not engaging in protected activity. *See id.* But this cannot change our finding that the language of Section 8(g) is "crystal clear" that no individual health care employee is required to give notice. *Montefiore*, 621 F.2d at 514.

In addition, our statement in dicta is directed toward the "*rest*" of a hospital's employees, meaning the ones who are not covered by the union notification. *See id.* For these employees to misrepresent their intentions to strike is distinguishable: union employees have *already given notice* of

25

their intent to strike via union compliance with Section 8(g).

For these reasons, the Board correctly determined that an employer cannot subvert the Congressional compromise reached in Section 8(g) by enforcing a plant rule requiring notification of absence.  The Foreword to the 1974 amendments makes it apparent that Congress specifically weighed the interests of employers and employees, in light of the "special considerations" relevant in the health care industry, in adopting a union notice rule but not an individual employee notice rule.  *See Legislative History*.  Notably, Congress balanced these interests in 1974, *after* the plant rule doctrine had been established.

Special Touch cannot override this policy choice: Section 8(g) trumps Special Touch's legitimate business reasons for enforcing an individual notice rule.  Thus, we do not believe that the aides' conduct was stripped of protection because they did not comply with Special Touch's call-in rule.  Instead, we hold that the aides' actions were unprotected because their uncorrected affirmative misrepresentations regarding their plans to strike in response to the pre-strike poll placed forty-eight of Special Touch's patients in foreseeable imminent danger.

## II. Imminent Danger Doctrine

The Board and Special Touch agree that otherwise lawful strikers' conduct is unprotected when employees "cease work without taking 'reasonable precautions to protect' the employer's plant, equipment, or patients 'from foreseeable imminent danger due to sudden cessation of work.'"[10] *Special Touch IV*, 2011 N.L.R.B. LEXIS 322, at *41 (quoting *Bethany Med. Ctr.*, 328 N.L.R.B. at 1094-95). The case that is often cited as providing the basis for this doctrine is *Marshall Car Wheel & Foundry Co.*, 107 N.L.R.B. 314 (1953), *enf. denied*, 218 F.2d 409 (5th Cir. 1955).

In *Marshall Car Wheel*, almost half of the employees at a foundry deliberately timed their walk-out (without giving advance notice) to coincide with the moment when molten iron in the plant cupola was ready to be poured off. 218 F.2d at 411. In determining whether the employees had engaged in protected conduct, the Board first recognized the general principle that an employee's right "to engage in concerted

---

[10] In its 2011 Order, the Board spelled out the NLRB's position as follows: "the General Counsel further asserts that Section 8(g)'s 10-day notice requirement, *combined with the principle that a strike will be deemed unprotected if employees fail to take reasonable precautions to protect the employer's plant, equipment, or products from foreseeable imminent danger,* already strikes the proper balance." *Special Touch IV*, 2011 N.L.R.B. LEXIS 322, at *13 (emphasis added).

activity is limited by the duty to take reasonable precautions to protect the employer's physical plant from such imminent damage as foreseeably would result from their sudden cessation of work." *Marshall Car Wheel*, 107 N.L.R.B. at 315. Although the Board found that the employees had deliberately endangered the plant, the Board determined that the evidence showed that the employer disciplined the employees because they violated a plant rule, not because their action caused a risk of damage. *See id.* at 318-19. The former basis for reprisal was insufficient to undermine the employees' rights to engage in concerted activity; therefore the Board declared the employees' conduct to be protected. *See id.* at 319.

The Fifth Circuit declined to enforce the Board's decision. *NLRB v. Marshall Car Wheel & Foundry Co.*, 218 F.2d 409 (5th Cir. 1955). The court disagreed with the Board's reasoning that the company "was not primarily concerned with the imminent threat of damage" but instead with the violation of its plant rule forbidding employees from leaving the plant without notice and permission:

> [The Board's] ultimate conclusion that it
> was the violation of the plant rule, and
> that alone, which respondent refused to
> condone or forgive seems to us
> illogically to confuse cause and effect,

28

> to make the tail wag the dog. *Assuredly the respondent was not more interested in preserving the inviolability of its plant rule, as such, than it was in protecting its plant from the extensive damage and loss which might have resulted from the illegal walkout*. On the ultimate issue of whether respondent was entitled to discharge or deny reinstatement to the offending strikers, the real inquiry is the character of the concerted activity engaged in, not whether the rule was incidentally breached thereby.

218 F.2d at 416-17 (emphasis added) (internal quotation marks omitted).

This case is a good example of how the plant rule doctrine and the "imminent danger" principle can be conflated – they will often go hand-in-hand. This is unsurprising; companies with a need to protect against dangerous work-related activity are likely to have rules in place for that purpose. *See*, *e.g.*, *Gen. Chem. Corp.*, 290 N.L.R.B. at 77. Regardless, while enforcing an internal company rule antithetical to Congressional intent is inappropriate, recognizing the applicability of the imminent danger doctrine (even if it concerns the same subject matter as the plant rule) is not only in keeping with the case law, it is good policy.

In the health care context, we cited *Marshall Car Wheel* in *Montefiore Hospital and Medical Center v. NLRB* for the

29

proposition that prior notice of concerted activity is required "only when a strike, by its timing or unexpectedness, creates great danger or is likely to damage the employer's business excessively." 621 F.2d 510, 515 (2d Cir. 1980). This Court then rejected the hospital's argument that two doctors' participation in a strike (without notice) put patients at risk and therefore stripped the doctors' conduct of protection. *See id.* at 516.

We reached this result because the doctors' main duties were in teaching and consulting, rather than patient care, and "[t]his was not a case in which patients were left lying on the operating table, emergency room personnel walked off, or people in need of immediate treatment were left to fend for themselves." *Id.* In addition, this Court noted that the clinic remained open with one doctor, three nurses and a receptionist during the strike. *See id.* at 512. Though short of its usual ten or twelve doctors and approximately twenty-five other personnel, the clinic was able to, and did, treat patients. *See id.*

The Seventh Circuit dealt with a comparable scenario in *East Chicago Rehabilitation Center, Inc. v. NLRB*, in which the majority determined that a brief walk-out by seventeen nurse's aides and support personnel at a nursing home did not

endanger the health of the facility's patients.  710 F.2d 397, 405 (7th Cir. 1983).  The majority gave several reasons for its conclusion that the unexpected walk-out was protected.

First, the court affirmed the Board's finding that the walk-out "caused inconvenience" but did not endanger patients.  *Id*. at 404.  Specifically, the Board had found that patients' meals and medications were delayed, patients' sheets were not changed punctually, and one deceased person's body was not removed in a timely fashion – a fact that the majority deemed "unpleasant[]."  *See id*. at 405.  Second, none of the strikers were doctors or nurses, supporting the Board's finding that the strike did not "jeopardize[] any patient's safety or health."  *See id*. at 404 (internal quotation marks omitted).  Third, the court noted that the nursing home refused to allow the striking employees to resume work, implying that the company was operating ably without them (and there was no evidence of replacements arriving).  *See id*. at 405.  Even so, the court viewed this as a "close case" which "might well have gone the other way," and noted that "at some point the cumulative distress to helpless patients caused by a walkout of nurse's aides might cross the line that separates inconvenience from inhumanity."  *Id.*

In the final health care case discussed in *Special Touch IV*, the Board re-affirmed the principle that Section 8(g) only requires notice from unions, not from individual heath care employees. *See Bethany Med. Ctr.*, 328 N.L.R.B. 1094, 1094 (1999). In *Bethany Medical Center*, the Board determined that a two-hour walk-out by catheterization laboratory employees who provided fifteen minutes' notice before the first procedure scheduled for the day was not "indefensible" conduct and did not create imminent danger. *See id.* at 1094–95. Before analyzing the facts, the Board stated that the "same standards of conduct" apply to health care employees as to employees in other industries. *Id.* at 1094. "Accordingly, the test of whether the catheterization laboratory employees' work stoppage lost the protection of the Act is not whether their action resulted in actual injury but whether they failed to prevent such imminent damage as foreseeably would result from their sudden cessation of work." *Id.*

Based on this standard, the Board determined that the employees' conduct was protected. *Id.* First, at the time of the walk-out, no patients were actually in the laboratory, nor did any patients require emergency treatment. *See id.* at 1094-95. Second, all of the procedures scheduled for the day were routine and able to be transferred to nearby hospitals.

*See id.* at 1094. The Board noted that any delays experienced were not exceptional and that the lab had a set policy for rescheduling, or "bumping," procedures – both routine and emergency. *Id.* at 1095. Third, the Board found that because there were "numerous other hospitals . . . in the near vicinity" with the same capabilities as the lab, the circumstances did not demonstrate a foreseeable risk of harm to patients. *Id.*

Board Chairman Truesdale analogized the fact pattern in *Bethany Medical Center* to that in *East Chicago*, finding that both of these cases involved situations where "there were other persons to 'provide cover' for the employees." *Id.* at 1095 n.9. Chairman Truesdale distinguished circumstances like these, in which striking workers are "provided cover," from those in *NLRB v. Federal Security*, *Inc.*, 154 F.3d 751 (7th Cir. 1998), in which a walk-out by security guards left a housing project unprotected. *See id.*

In *Federal Security*, the Seventh Circuit refused to enforce the Board's decision that security guards who abandoned their stations at a dangerous public housing complex in Chicago (leaving at least four posts completely unguarded) had engaged in protected activity. 154 F.3d at 752-53, 756. The housing complex hired around-the-clock armed guards to staff posts, sweep buildings for weapons and

33

drugs, and verify that only residents and guests entered the facilities. *See id.* at 753. The court determined that the protection provided by the guards was critical – a finding contained "in record evidence undisputed by the parties but largely unmentioned by the ALJ." *Id.* at 756. Given the guards' protective duties, the Seventh Circuit determined that even though the complex was left unguarded for only twenty minutes, that was enough to place residents in danger. *See id.* at 757.

The court identified a "clear" distinction between the facts in *Federal Security* and those in *East Chicago*: "[W]hile the nurses' aides left behind doctors, nurses, and other front-line health care workers to provide cover, here the guards were the front line, leaving behind unattended stations and vulnerable residents." *Id.* at 756. Moreover, the Seventh Circuit took issue with the ALJ's focus on whether harm *actually* occurred as a result of the walk-out. *See id.* at 756-57. The court explained that the imminent danger doctrine[11] "does not ask whether anyone actually was harmed by the activity otherwise protected; it asks whether the activity endangered anyone to the point that harm was foreseeable." *Id.* at 757. Since "otherwise protected

---

[11] Therein referred to as the "'health and safety' exception." *See id.* at 757.

34

activity surely loses its protection when it compromises the safety of others," the guards' conduct was not protected under the NLRA. *See id.* at 755, 756.

We have no doubt that this case is more akin to *Federal Security* than to *East Chicago*. The Board, however, was dismissive of the argument that Special Touch's patients were placed at risk by the aides' conduct. This view is traceable to two sources.

First, the ALJ in *Special Touch I* used the wrong standard to assess whether the imminent danger doctrine was in play (as in *Federal Security*), observing that "[a]t the end of the day on June 7, 2004, there were only about five clients for whom the Respondent could not get coverage. And as to them, there was no evidence that they suffered any adverse consequences." 2005 N.L.R.B. LEXIS 472, at *20. Actual harm to patients is not the issue. The appropriate inquiry is focused on the *risk* of harm, not its realization. The Board was quite clear in *General Chemical*: "Although no actual damage took place, that is not the test. There was a reasonably foreseeable possibility of danger – the purpose of the [plant] rule." 290 N.L.R.B. at 83. Likewise, in *Federal Security*, the Seventh Circuit specifically noted that "[w]hether actual harm resulted is hindsighted and irrelevant. The proper focus is that the unguarded stations

35

unquestionably heightened the danger to residents." 154 F.3d at 757. The standard is well-established for good reason. Penalizing companies for disciplining employees whose indefensible conduct fortuitously yields no damage would not serve the underlying purpose of the doctrine – avoiding unreasonable risk. It would be cruel to hold well-meaning entities accountable for their employees' good luck.

Second, although the Board cabined its focus to danger (rather than actual harm) in *Special Touch IV*, it also observed that it was unaware of any case in which "imminent danger" existed along with properly given Section 8(g) notice. 2011 N.L.R.B. LEXIS 322, at *22. And, while "under appropriate circumstances, [the Board] would entertain an argument that despite prior notice, a strike, or particular employees' participation in a strike, created an imminent danger," the Board did not believe that the situation here qualified. *See id.* at *22 n.17.

The facts in this case are not disputed. The Board acknowledged that Special Touch patients "have a wide range of physical and mental conditions ranging from depression to diabetes to poststroke partial paralysis." *Id.* at *3. Still, the Board did not believe that Special Touch aides' presence in patients' homes was necessary to prevent a foreseeable risk of harm. At oral argument, attorneys for

36

the NLRB supported this position by explaining that many of the aides advised their patients or patients' families that they would be absent on the day of the strike (thus alleviating the danger) and that, regardless, if an emergency did arise, the aides are unable to administer medication. We disagree with the Board's application of the law to these facts and to the record as a whole. Neither the aides' individual notice to patients nor the aides' inability to perform medical services significantly mitigates the risks posed when a home health care aide neglects to attend his or her patient.

It was undisputed that Special Touch aides care for patients who are referred to nursing agencies by physicians or hospitals and it is this contracting agency that ultimately determines whether a patient can be left alone at any given time. For example, Special Touch Vice President Keehn testified that if a patient resists having an aide on any given day, or even if a family member of the patient offers to take care of the patient instead, Special Touch

> would then consult with the contracting agency just to see if that would be acceptable to them because we couldn't cancel the service even for the one day without reporting it to the nursing staff, contracting agency nursing staff. And they do say no. Sometimes they say, no, we don't think it's a good idea.

(JA 503.)

37

There is an obvious explanation: medical professionals do not want people without training to be responsible for taking care of elderly, sick and/or homebound patients.

For this reason, it is irrelevant that many of the forty-eight aides who did not call in or show up on June 7, 2004 warned their patients in advance. While this gesture is well-meaning, it does not remove the danger. First, many of the patients served by Special Touch live alone and there is no one readily available to cover for an absent aide. Some of the company's patients live with equally aged and infirm spouses or siblings.[12] Second, even if a patient does live with family, these individuals have not been trained to provide the care the patient needs. And finally (but critically), many of Special Touch's patients do not appreciate the degree of care that their conditions require.

The aides who work at Special Touch receive weeks of training designed to help them take care of patients who, like some of the forty-eight who were left alone on June 7, 2004, have conditions including Parkinson's disease, early-onset Alzheimer's disease and other memory problems,

---

[12] For example, Norma Lindao, one of the forty-eight aides at issue, was assigned to care for a couple from 9:00 a.m. to 5:00 p.m. six days per week in June of 2004. The husband had Parkinson's disease and early-stage Alzheimer's disease and the wife suffered from epilepsy.

epilepsy, broken limbs, diabetes, osteoporosis, breast cancer, developmental disabilities, impaired mobility and recent strokes.  Although not all of these patients were slated to receive twenty-four hour care, they were all subject to nursing plans that prescribe some measure of supervision and assistance.  The primary reason for aides to be present in patients' homes is prevention.  The Special Touch aides are the primary link between the nursing agency and the patients and their job is to observe the patients and ensure their safety.

The consequences of aides not showing up to patients' homes and failing to secure replacements in advance could very well be dire.  In the Decision and Order that the Board asks us to enforce, the Board makes light of the aides' duties, describing them as "cleaning, shopping, bathing, reminding customers to take their medication, and observing customers for signs of immediate distress, such as dizziness or chest pains."  *Special Touch IV*, 2011 N.L.R.B. LEXIS 322, at *3.  But the reason aides perform light cleaning is to decrease the chance that their frail and elderly patients will trip over an obstacle or slip on a dirty floor.  Likewise, the reason the aides help their patients with

shopping is that many of the patients have trouble walking and are homebound.

It is true that some patients are occasionally left alone – even when an aide is on duty – but in these situations, the aide first places a phone with emergency phone numbers near the patient, ensures that the patient has taken any necessary medications, has gone to the bathroom and is in a comfortable position, *and* the aide must call a coordinator at Special Touch to inform the agency. The evidence shows that patients who are left alone when they, their families and their physicians expect that an aide will be present are exposed to "foreseeable imminent danger."

On June 7, 2004, when forty-eight aides did not arrive as expected at their patients' homes, their actions gave rise to this danger. This is not a case like *Montefiore*, where one physician and three nurses remained available to help patients in need. *See* 621 F.2d at 512. This is not a case like *East Chicago*, where two nurse's aides and four nurses kept working in the nursing home and were available to assist the elderly. *See* 710 F.2d at 407 (dissent). This is not a case like *Bethany Medical Center*, where routine operations were delayed and transferred to other hospitals, and emergency procedures could be redirected to "numerous other

40

hospitals . . . in the near vicinity." *See* 328 N.L.R.B. at 1095. Instead, this is a case like *Federal Security*, where workers completely abandoned their assigned posts, exposing the people they were hired to care for and protect to foreseeable and imminent danger. *See* 154 F.3d at 753-57.

Before this Court, the Board emphasized the lack of prior notice provided to employers in each of these cases. Here, the Union gave the requisite ten-day notice of its intent to strike pursuant to Section 8(g). As previously discussed, the employees were not required to give individual notice – not by Section 8(g) and not by Special Touch's plant rule. But the aides were required to take "'reasonable precautions to protect' the employer's . . . patients 'from foreseeable imminent danger due to sudden cessation of work.'" *Special Touch IV*, 2011 N.L.R.B. LEXIS 322, at *41 (quoting *Bethany Med. Ctr.*, 328 N.L.R.B. at 1094-95). By misleading Special Touch into believing that each of the forty-eight aides' patients would be covered during the strike, the aides exposed their patients to the risk of harm.

To be clear, this is not a roundabout way of establishing an individual employee notification rule. Had Special Touch not reached out to their aides in advance of the strike in an attempt to plan ahead (as the company is

41

authorized to do pursuant to Board precedent), the aides would not have been required to call in.  The Union's notice sufficed to advise the company that all of the approximately 1400 aides scheduled to work on June 7, 2004 might be on strike.  If an employer does not take it upon itself to inquire further, the employer should be considered to have received notice of 1400 absences.  Moreover, there is no requirement that an employee answer its employer's request for information.  The Board made it clear in *Preterm* that an employee cannot be forced to tell the employer whether or not the employee plans to strike – this would constitute an impediment to engaging in protected activity.  *See* 240 N.L.R.B. at 656.  What employees cannot do is mislead their employer into expecting their presence when the lack thereof will result in foreseeable imminent danger.

Despite the fact that forty-eight aides never started work on June 7, 2004, it can still be said that foreseeable imminent danger resulted from their "sudden cessation of work."  Until approximately twenty minutes after each of the forty-eight aides' shifts began, Special Touch believed that it had these patients covered.  The "sudden cessation of work" occurred when the company determined that nearly fifty of its aides were absent and that it would need to secure

42

replacements (many of whom would need to speak Spanish) as fast as possible.[13]  This twenty-minute period (the bare minimum for which a patient might have been without coverage on June 7), was enough time for harm to have occurred.  *See Federal Security*, 154 F.3d at 757.  Moreover, while forty-three patients received partial coverage on the first day of the strike, an additional five patients were left alone entirely when the company could not secure replacements.

The burden on employees is minimal.  It is simply not to mislead an employer about whether an employee plans to work when an unexpected absence will create a risk of harm to the employer's plant, equipment or patients.  This obligation extends to all industries.  Indeed, the resolution of this case has very little to do with Section 8(g) or the requirements imposed on health care employees and employers by Congress.

This case, and our opinion, merely invokes the established Board principle that an employee must take reasonable precautions not to create foreseeable imminent danger.  The parties and the Board all agree that this is the standard.  Indeed, the Board identifies the employer's right

_____

[13]  This task was made even more difficult because Special Touch had already pulled seventy-five replacements from its additional pool of aides to fill in for the aides who informed the company of their plans to strike.

to discipline employees who fail to meet this burden as one of the reasons why an individual employee notification requirement is unnecessary in the health care industry. *Special Touch IV*, 2011 N.L.R.B. LEXIS 322, at *41. The forty-eight Special Touch aides who affirmatively misrepresented their intent to work on June 7, 2004 engaged in "indefensible conduct" that is not protected by the NLRA. As a result, Special Touch's failure to immediately reinstate these employees did not violate Section 8(a)(1) or (3).

## Conclusion

For the foregoing reasons, the petition of the National Labor Relations Board to enforce its June 30, 2011 Decision and Order is **DENIED.**